# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HITACHI KOKI CO., LTD.,      )
                                        )

                Plaintiff,   )
                                          )     Case No. 07-CV-01504 (ESH)

v.                             )
                                        )     **ORAL HEARING REQUESTED**

JON W. DUDAS, Director, United States   )
Patent and Trademark Office,         )
                                        )

                Defendant.   )

---

## PLAINTIFF HITACHI KOKI CO., LTD.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Jon W. Dudas's (the "PTO") opposition paper is premised on two erroneous positions.

First, in contravention of prevailing case law, the PTO attempts to improperly narrow the circumstances under which a patent applicant is permitted to submit new evidence to this Court in a Section 145 proceeding. Plaintiff, Hitachi Koki Co., Ltd. ("Hitachi"), may supplement its evidence and the Court should consider the four declarations for two reasons: (1) because supplementation of evidence is permitted in a 35 U.S.C. § 145 review, and (2) the few limitations that do exist on supplementation of evidence do not apply in the factual circumstances of this case.

Second, acting as judge and jury, the PTO summarily concludes that the unpatentability of Hitachi's invention was supported by substantial evidence. Not only is this conclusion not supported by the record below, but the PTO's position is tantamount to a simple insistence that the Board (its "client") was correct. The notion that this Court must rubber stamp any opinion of the Board eviscerates the intent of § 145. The PTO would turn the District Court of the District

of Columbia into nothing more than a waiting room for the Federal Circuit.  As fully

documented in Hitachi's Motion for Summary Judgment (the factual portion of which the PTO

has not rebutted), the PTO misapplied prior art reference teachings in its final decision.  As such,

the Board's finding of obviousness cannot be sustained.  Even without the disputed declarations,

Hitachi has demonstrated that <u>none</u> of the cited references (common to all rejections) discloses a

device capable of making ±45° bevel cuts.  The PTO does not dispute this fact, arguing instead

only that submission of the declarations[1] were improper.  Thus, summary judgment in Hitachi's

favor is appropriate.

**ARGUMENT**

I.   **UNDER 35 U.S.C. § 145, HITACHI IS ENTITLED TO PRESENT THE ADDITIONAL EVIDENCE FIRST SUBMITTED IN ITS OPPOSITION TO THE PTO SUMMARY JUDGMENT MOTION, AND NOW USED IN ITS OWN SUMMARY JUDGMENT MOTION; EVIDENCE THAT DEMONSTRATES THE NON-OBVIOUSNESS OF THE CLAIMED SUBJECT MATTER**

   A.   <u>**Courts Uniformly Permit Parties to Present New Evidence in Addition to the Administrative Record Below in an Action Under § 145**</u>

Courts have uniformly held that district court review of a PTO action under Section 145

affords litigants the opportunity to "present additional evidence or to argue the previous evidence

afresh."[2]  *See, e.g., Mazzari v. Rogan,* 323 F.3d 1000, 1004-05 (Fed. Cir. 2003).   It is well-

settled that an applicant may "present to the court evidence that the applicant did not present to

the PTO." *Dickinson v. Zarrko*, 527 U.S. 150, 164 (1999), *see also Fregeau v. Mossinghoff,* 776

F.2d 1034, 1036-37 (considering new evidence based on a declaration).  *Id.*  This evidence can

---

[1] The declarations were submitted by Hitachi in response to the PTO's Motion for Summary Judgment and only later used in support of Hitachi's Motion for Summary Judgment.

[2] Even the PTO's Manual of Patent Examining Procedure ( "MPEP") (which is binding on the PTO) agrees with Hitachi.  *See* MPEP § 1216.02 (Eighth Ed., 2007 revision) "In an action under 35 U.S.C. 145, the plaintiff may introduce evidence not previously presented to the U.S. Patent and Trademark Office".  (Attachment A)

take the form of "new testimony," "proffered testimony" or "additional evidence." *See Winner Int'l Royalty Corp. v. Wang,* 202 F.3d 1340, 1346 (Fed. Cir. 2000) (citations omitted). "While the evidentiary record before the Board serves as the 'evidentiary nucleus' of the district court proceeding . . . the parties are entitled to submit *additional* evidence." *Gould v. Quigg,* 822 F.2d 1074, 1076 (Fed. Cir. 1987) (emphasis added). When new evidence is presented, district courts are required to make *de novo* findings "to take such evidence into account together with the evidence before the board." *Fregeau,* 776 F.2d at 1038.

The four declarations submitted by Hitachi present new evidence relevant to both (i) the issues raised before the Board by Hitachi; or (ii) the newly minted rejections issued by the Board. Declarant Paul Hatch explains how the Johnson, Langworthy and Ambrosio references do not disclose devices which are capable of making ±45° bevel cuts (as explained in more detail in Section II, B below). Similarly, declarant Gary Katz opines on the problems faced by carpenters, including the same problems identified by the Board, making "left and right 45 degree angular cuts, on a work piece without flipping the work piece." Exhibit 2 at 9-10. Declarants Hopkins and Ushiwata present evidence going to objective criteria of non-obviousness. All fall squarely within the categories of one or more of permitted "new testimony," "proffered testimony" or "additional evidence." *See Winner Int'l Royalty Corp. at 1346* (Fed. Cir. 2000).

### B.    The Evidence Presented by Hitachi Falls Squarely Within the Scope of § 145 and Should be Considered by This Court

Absent justification (such as a new ground of rejection), Courts have refused, in § 145 cases, to admit evidence used to raise wholly new issues. *See MacKay v. Quigg,* 641 F. Supp. 567, 568 (D.D.C. 1986) ("A district court may only evaluate 'new' evidence if it supplements issues previously raised before the PTO.") *Accord* MPEP § 1216.02. Likewise, courts have

- 3 -

excluded evidence where it was "withheld" from the PTO as a result of fraud, bad faith or gross negligence. *Monsanto Co. v. Kamp*, 269 F. Supp. 818, 822 (D.D.C. 1967). *See also* MPEP § 1216.02. None of these limitations apply here.

The four declarations submitted by Hitachi present new evidence in support of its arguments below but do not raise wholly new issues. The distinction between new evidence and new issues is noteworthy since the D.C. Circuit has observed only that parties are "precluded from presenting new *issues*" that were not presented to the Patent Office. *See DeSeversky v. Brenner,* 424 F.2d 857, 858 (D.C. Cir. 1970) (emphasis added).[3] Properly read, the *DeSeversky* case simply stands for the axiom that absent some justification, an applicant patent owner cannot raise new issues on appeal. New evidence is not synonymous with new issues. *See Takeda Pharm. Co. v. Dudas,* 511 F. Supp. 2d 81, 86-87 (D.D.C. 2007) (acknowledging the distinction between new evidence and new issues and permitting the submission of a declaration).

In this instance, the PTO has not disputed that the evidence contained in the disputed declarations "supplements the issues previously raised before the PTO." *MacKay,* 641 F. Supp. at 568. Indeed, the vast majority of the evidence contained in the declarations relates to issues presented at the administrative level. For example, whether the Johnson references disclose devices which are capable of making ±45° bevel cuts was previously raised with the Board. Similarly, the problems faced by carpenters, including the same problems identified by the Board, making "left and right 45 degree angular cuts, on a work piece without flipping the work piece." Exhibit 2 at 9-10.

---

[3] Even the MPEP honors the distinction between generally permissible new "evidence" and generally impermissible new "issues". *See* MPEP § 1216.02, noting plaintiff can only raise new issues where there "some reason of justice put forward for failure to present the issue to the U. S. Patent and Trademark Office."

- 4 -

The other technical portions of the declarations, directed to Johnson and Langworthy, relate directly to a new rejection.[4] As this Court has routinely acknowledged, to satisfy administrative due process, "[a] patent applicant must have the opportunity to respond to new grounds for claim rejections put forth by the Board." *Hyatt v. Dudas,* Civ. A. No. 03-0901, 2005 WL 5569663, at *6 (D.D.C. Sept. 30, 2005) (citing *In re Waymouth,* 486 F.2d 1058, 1061 (CCPA 1973)) (Attachment B). A rejection is considered new where the rationale or reason for the rejection differs from that of the prior rejection. *See In re Kumar,* 418 F.3d 1361, 1368 (Fed. Cir. 2005). Although the court in *Hyatt* rejected plaintiff's attempt to offer new evidence and held that there were no new rejection grounds to justify the additional submission of evidence, that case is distinguishable and the PTO's reliance on it is misplaced. *See Hyatt,* 2005 WL 5569663, at *6. As detailed below, in the present case, additional new grounds of rejection (on obviousness), never made in the examiner's Final Rejection, were instituted by the Board, thereby justifying (indeed inviting), post-decision submission of evidence on these references.

Similarly, Hitachi's post-decision submission of evidence of objective criteria of non-obviousness is admissible as it relates directly to the new rejections. The only evidence presented by Hitachi that even arguably relates to "new issues" would be the evidence relating to objective criteria of non-obviousness offered in the declarations of Mr. Hopkins and Mr. Ushiwata.[5] However, because applicant is now faced with newly minted obviousness rejections

---

[4] As detailed in Part I(B)(1) below, the PTO incorrectly states that the Langworthy and Ambrosio rejections are not new. However, even if the PTO's position is accepted, the declarations would still come in as they would be new evidence on previously raised issues.

[5] As objective criteria of non-obviousness is necessarily a part of the obviousness inquiry, Hitachi would not agree that even this is a new issue. *WMS Gaming, Inc. v. Int'l Game Tech.,* 184 F.3d 1339 (Fed. Cir. 1999) ("the consideration of objective evidence by the patentee is a necessary part of the obviousness determination .... The objective evidence of non-obviousness may be used to rebut a *prima facia* case of obviousness based on prior art references. *See also Winner Int'l v. Wang,* 202 F. 3d 1340 (Fed. Cir. 2000). Finding that raising an issue of objective evidence (i.e., commercial success) "necessarily raised" related issues as well.

(continued...)

from the Board, these declarations are admissible because Hitachi never had cause to present such evidence during the administrative proceedings. Although Hitachi agrees that issues of objective criteria of non-obviousness (a.k.a., secondary considerations), such as copying by others and commercial success, are inextricably a part of the obviousness inquiry,[6] in this case (during prosecution of the reissue application at the PTO) Hitachi time-after–time overcame the Examiner's obviousness rejections without the need to present such rebuttal evidence. Thus, that evidence first became relevant when the Board offered a new rationale for rejecting the claims; a rationale that constituted a new rejection, based on what the Board considered (albeit erroneously) to be a case of *prima facia* obviousness.[7]

       1.     In the Final Rejection, the Examiner Never Applied Either the Langworthy or Ambrosio References Against Any Claim

The differences between the myriad of rejections made by the Examiner and those instituted by the Board are substantive, not merely semantic as was the case in *Hyatt*. First, Langworthy and Ambrosio were first cited (but not applied) by the Examiner in the Final Office Action immediately preceding this appeal, which is procedurally improper, but in any event not a "rejection." In fact, were the examiner to have even attempted to so, it would have been in direct contravention of the PTO's own rule. *See* 37 C.F.R. § 1.193(a)(2) ("An examiner's answer must not include a new ground of rejection…") and 37 C.F.R. § 1.193(a)(2). Later, in his

---

[6] *See* footnote 3, *supra*. The trier of the obviousness issue, be it the PTO or a court, must consider objective evidence of non-obviousness when presented.

[7] Objective evidence of non-obviousness may be used to rebut a *prima facie* case. *See Graham v. John Deere*, 383 U.S. 1, 17 (1966); *see also In re Kumar*, 418 F.3d 1361 (Fed. Cir. 2005) ("The prima facie case is a procedural tool. After the PTO presents sufficient evidence to support a ruling of obviousness … the burden shifts to applicant to rebut it. Once rebutted, e.g., by objective evidence of non-obviousness, the *prima facie* case is dissipated.")

Answer to Hitachi's Opening Brief in the appeal, the Examiner informed the Board that it "may choose to ignore Langworthy and Ambrosio…" as they were "brought in mainly for the dependent claims…"  Answer at 12.  Later, in that same Answer, the Examiner appears more definite about dropping reliance on Langworthy and Ambrosio, at least for purposes of claim 1. The Examiner states "these patents [Ambrosio and Langworthy] *were only mentioned* to cover some features of the dependent claims.  Since Appellant has stated that all claims stand or fall with claim 1, *there is not much point in arguing about Langworthy or Ambrosio*."  Answer at 15 (emphasis added).  After so stating, the Examiner proceeds to <u>substantively</u> discuss those references (Answer at 5, 7 and 9-10).

Confronted with this confused record,[8] applicant, in its reply brief, informed the Board that:

> "As the record now stands, Appellant (and the Board) is left to conclude that the Examiner has accepted Appellant's argument that Langworthy and Ambrosio do not provide support for an obviousness rejection of claim 1.  Therefore, despite the Examiner's continuing discussion of these references in his Answer, he has apparently withdrawn any rejection of the claims at issue based on Langworthy and Ambrosio.  Appellant urges the Board to view the Examiner's statements in his Answer as non-specific commentary regarding the scope of the teachings and suggestions of Langworthy and Ambrosio and as an concession that these references fail to provide any suggestion or motivation relevant to the obviousness of claim 1."  Applicant's Reply at 4.

---

[8] This "fake left, go right" ploy is exemplary of the "haphazard" prosecution (as characterized by the Board in its Decision, Exhibit 2 at 4) that does indeed appropriately characterize this now 8 year and counting marathon reissue proceeding.  It was to get off the PTO merry-go-round that Hitachi was forced to appeal to the Board and now to this Court.  Hitachi attaches hereto Exhibit A from its Brief before the Board, a chart setting forth the endless zigs and zags of the examination; zigs and zags that reflect the examiners consistent withdrawal of one ground of rejection after another; thus obviating at each turn any case of *prima facia* obviousness, thereby rendering submission of rebuttal evidence, in the form of objective evidence of non-obviousness, unnecessary.

Until the Board issued its decision in the appeal, at no point was Hitachi presented with a rejection based on Langworthy or Ambrosio.[9] Thus, the Board's application of Langworthy and Ambrosio against claim 1 was (in every possible sense) a "new ground" of rejection. As such, Hitachi must be permitted to respond to it. *See In re Waymouth*, 486 F.2d 1058, 1061 (CCPA 1973) ("To attempt to deny appellants an opportunity to provide a different and appropriate response to the board's rejection . . . does not satisfy the administrative due process established by Rule 196(b) of the Patent Office.").

The PTO appears to raise the rather bizarre contention in its Opposition that applicant could have filed the declarations in connection with its request for rehearing to the Board (Opposition at 8-9) This PTO contention is a border-line silly attempt to create a CATCH-22. By PTO rule, a request for rehearing to the Board is not amenable to providing expert declarations or for presenting new or "afresh" evidence of any kind. *See* 37 CFR § 41.33(d). Thus, unlike the plaintiff in *Hyatt*, Hitachi has not had a "fair opportunity to react to the thrust of the rejection." *See In re Kronig,* 539 F.2d 1300, 1302-03 (CCPA 1976).

Unlike in *Hyatt*, Hitachi has done more then "baldly assert" (Opposition at 8-9) that the omission was not negligent or intentional. The unrebutted facts demonstrate that the examiner made no rejection of pending claim 1 based on the combination of references now asserted by the Board and that no such rejection existed until the Board's decision. The PTO, presumably well versed in their own rules, cannot dispute this fact. The existence of new grounds of

---

[9] In the decision, the Board conceded its confusion and that it was starting afresh: "it is not clear from this record the extent to which the examiner continues to rely on the prior art teachings of Langworthy and Ambrosio. (Decision at 4). The Board also conceded that "the knowledge and skill in the art has not been discussed adequately [by the examiner]." Decision at 5. The Board acknowledged that in view of the long but dismal record by the examiner it would proceed with its own review of the claim and the prior art. *Id*. at 5.

rejection[10] not only justifies admission of the declarations, it demands it. Not only is the

disputed declaration evidence permissible under § 145, its admission is a matter of administrative

due process. *See In re Waymouth,* 486 F.2d at 1061.

### C.   This Court Should Reject the PTO's Narrow Interpretation of the Statute as Contrary to the Purpose of a § 145 Action

The ability to supplement the evidence beyond the administrative record distinguishes a §

145 review from a traditional (direct) appeal (to the Federal Circuit) under 35 U.S.C. § 141.

Ignoring this important distinction, the rationale urged by the PTO would eviscerate § 145. In

the direct appeal to the Federal Circuit, the court makes its determination by evaluating only the

administrative record. 35 U.S.C. § 143. By contrast, in a district court appeal under § 145, the

court can consider new evidence to supplement the Board's factual determinations (provided

only that the evidence does not raise new issues that were not before the Board). *See DeSeversky*

*v. Brenner,* 424 F.2d at 858 ("plaintiff . . . may introduce evidence not previously presented to

Patent office"). The underlying purpose of this bifurcated appeals system is to give litigants the

option of presenting new evidence and of a *de novo* review. As the Federal Circuit has

acknowledged:

> A district court action under 35 U.S.C. § 145 is a *de novo* determination of patentability.
> It is not limited to the record before the PTO. Unless a party is prejudiced thereby or due
> process is denied, expeditious justice is better served by avoiding artificial restrictions on
> the district court's authority to resolve all issues reasonably raised in the proceeding.

*Newman v. Quigg,* 877 F.2d 1575, 1579 (Fed. Cir. 1989).

---

[10] Further, in addition to the procedural reasons why the Board authored a new rejection, the new rationale used by
the Board to support its rejection certainly qualifies as "tantamount to a new ground of rejection." *See In re
Hounsfield,* 699 F.2d 1320, 1324 (Fed. Cir. 1983). *See also* 37 CFR § 40.50(b) regarding new grounds of
rejection and mandatory request for rehearing to render the new the rejection judiciable on appeal.

Limiting the submission of new evidence in the narrow manner now advocated by the PTO would render an appeal under § 145 to one nearly indistinguishable from a direct appeal to the Federal Circuit, and would render the purpose of the statute duplicative and meaningless.[11]

## II.    HITACHI IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE BOARD IMPROPERLY INTERPRETED THE PRIOR ART REFERENCES AND BECAUSE ITS LEGAL CONCLUSION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE OR THE LAW

As explained in Part B of Section II below, even without the declaration evidence, the Board's decision is unsupported by substantial evidence.  However, the disputed declarations bolster Hitachi's position that the Board's finding of obviousness cannot be sustained.  The enhanced evidentiary record demonstrates that (1) the Board misinterpreted the prior art references as a matter of law and (2) made improper factual findings not supported by substantial evidence.

### A.    The Board's Conclusion of Obviousness is Erroneous Because the Board Ignored the Perspective of one with Ordinary Skill in the Art and Other Objective Evidence of Obviousness

As Hitachi argued in its initial motion, obviousness is based on underlying factual inquiries regarding "the scope and content of the prior art, the level of ordinary skill in the field of the invention, the differences between the claimed invention and the prior art, and any objective evidence of non-obviousness such as long-felt need, and commercial success." *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1734 (2007) (referring to the "*Graham* factors" as recited in *Graham v. John Deere*, 383 U.S. 1, 17 (1966)).  The Supreme Court has cautioned against a rigid application of the Federal Circuit's so-called teaching-suggestion-motivation test

---

[11] Hitachi agrees that certain costs associated with Defendant's expert discovery must be borne by the plaintiff. Def's Reply at n. 2.  This Court, however, has recognized that Plaintiff will only be responsible for such costs and expenses as the Court deems "reasonable."  *Aktiebolag v. Santrade, Ltd.*, Civ. A. No. 89-3127-LFO, 1991 U.S. Dist. LEXIS 1811 (D.D.C. Feb. 7, 1991).  (Attachment C)

to avoid impermissible use of hindsight when combining references. *Id.* at 1739. Nevertheless, even applying the obviousness statute flexibly, when "formulating a rejection under 35 U.S.C. § 103 based upon a combination of prior art elements" PTO personnel must "identify the reason why a person of ordinary skill in the art would have combined the prior art elements in the manner claimed." *See* PTO Memorandum to Directors, May 3, 2007, at 2 (Attachment D). The unrebutted evidence demonstrates that the PTO has failed to adhere to these standards here. Thus, for the following reasons, the Board's obviousness determination must fail.

First, the Board ignored the perspective of one with ordinary skill in the art. The Board makes reference to persons having ordinary skill in the art (*See* Exhibit 2 at 14, 15, 16, 17) and makes conclusory allegations about what such persons would understand about the prior art - but never identifies the educational, experience or skill attributes of such a person or the basis for its conclusory allegations, which it presents as "findings".[12] The PTO now seeks to insulate, as a factual finding, the Board's unsupported conclusion that one of skill in the art would, have known (such and such) and that this (undefined) person would have done (such and such) thing. *See, e.g.*, Board Decision, Exhibit 2 at 14, 15, 16, 17. Thus, for exactly the same reason as the PTO was reversed in *Brand* (see note 12, intra), the Board erred here, attributing knowledge or actions to a person of ordinary skill based on its own expertise and without record citation. *Compare* Exhibit 2 at 17 wherein the Board stated, without citation to the record, that person of

---

[12] Making such conclusory findings without record support is reversible error in and of itself. *See Brand v. Miller*, 487 F.3d 862, 864 (Fed. Cir. 2007) (reversing the PTO Board for "impermissibly rely[ing] on its own expertise" as opposed to "substantial record evidence") *See also In re Rouffert*, 149 F.3d 1350, 1359] (Fed. Cir. 1998) ("The Board's naked invocation of skill in the art to supply a suggestion to combine the references cited in this case is ... clearly improper.") Even post-*KSR* (where no express suggestion is required to combine art) the mere unsubstantiated invocation of the mantra "person of skill in the art" contravenes the rationale of *Brand.*

skill in the art would understand Johnson had a ±45° cutting capability, *with* similar statements reversed in *Brand*, 487 F.3d at 866.

Second, other evidence precludes a finding of obviousness. In formulating its rejection and reading the prior art applied, the Board confused miter cuts and bevel. *See* Material Facts 10-12.[13] In formulating its rejection, the Board did not even take cognizance that the claimed invention is direct to a compact "desktop" saw. Material Facts 13 & 14. The Board on the one hand ignored the claimed size and placement specifications in terms of the saw shaft, the motor shaft that give rise to the ±45° bevel angle capability in a compact desk top saw (*see* Material Facts 19, 23-29 (re Hatch), 30-34 (re Langworthy), 36-42 (re Ambrosio)) and improperly relied on patent figures for scale and relative positioning of saw parts. *See* Material Facts 50-53.

Even post-*KSR*, certain immutable rules of obvious were ignored by the Board. When evaluating the differences between the claim invention and the prior art (as required by 35 U.S.C. § 103 and Supreme Court jurisprudence, such as *KSR* and *Deere*)) the Board is required to consider the claimed invention "as a whole," i.e., as a compact, desktop saw (where the size and location of parts is critical) not on a part-by-part (i.e., a shaft here, a saw blade there) basis. *See Ruiz v. Chance*, 357 F.3d 1270, 1275 (Fed. Cir. 2003). Consideration of the invention as a whole is statutorily mandated to guard against "hindsight discounting of the value of new contributions." *Id.* This the Board utterly failed to do. Coupled with the substantive misapprehension of the prior art (discussed in Part II below), this demonstrates that the Board's rejection is not only unsupported by substantial evidence, it is contrary to both statutory law (§ 103) and case law.

---

[13] The PTO did not deny these facts but did object to the form in which they were presented.

**B.**    **The Board' Conclusion Regarding the Prior Art Capability to Bevel Cut ±45 Degree Is Not Supported By Substantial Evidence**

As alluded to above, the Board's so-called factual findings are not supported by substantial record evidence. In particular, the Board's conclusions regarding the 45° bevel cut capability are improper and unsupported. As concluded by the Board, none of the references teach the "specific dimension" recited in the applicant's claims.[14] Without such evidence the Board (and now the PTO) draw improper conclusions from the not-to-scale drawings found in the prior art. *See Nystrom v. Trex Co.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005) ("speculative modeling premised on unstated assumptions in prior art patent drawings cannot be the basis for challenging the validity of claims reciting specific dimensions not disclosed directly in such prior art."). However, the PTO does not dispute that it would be improper to rely on the figures of the cited references as the basis for disclosure of the claimed elements. Opposition at 5. Thus, the issue turns on whether the Board (and now the PTO) did the very thing it concedes would be improper. As the record and logic clearly show, it did.

As to Johnson, the Board stated that Johnson discloses a "compound angle disk cutting apparatus" intended to "solve the problem" of making "left and right 45 degree angular cuts, on a work piece without flipping the work piece." Exhibit 2 at 9-10. As its sole support for this contention, the Board states in its cite "See Johnson's Figure 1, the composite of cutting member 19, motor 41 and drive train 43 with '±45 capability of the cutting member positioning mechanism 17' (Johnson, col. 5, 1. 14-15; col. 7, 1. 11-12)." First, the structure of the PTO's cite makes clear that it is relying on Figure 1 of Johnson for its conclusion. Second, the cited passages refer to Angle C as shown in Figs. 2 and 3, not Angle B. Angle C is the miter angle, not the bevel angle in applicant's claims. Now, Hitachi provides the Court with record evidence

---

[14] Incredibly, the Board considered this fact "immaterial". Decision, Exhibit 2 at 16-17.

of the characteristics and attributes of a person of ordinary skill in the art and how such a person would view the prior art relied on by the Board. How does the PTO respond? It tries to exclude the most probative evidence offered to this Court, thereby leading the Court into the very same error for which the Federal Circuit criticized the Board in *Brand*.

It is undisputed that cutting member positioning mechanism 17 is the entire positioning assembly as indicated in Fig. 1 and in the specification. *See* Johnson, Fig. 1 and col. 4:4-9; 4:17-23. It is also undisputed that the cutting member positioning mechanism 17 is designed to impart cutting angles B and C as shown in Fig. 2. Johnson, col. 4:52-64. The passages cited by the Board (and now championed by the PTO) relate only to angle C. This is clear when the <u>entire</u> cited paragraphs are read:

> FIG. 3 illustrates yet another embodiment of the present invention wherein 10 axes or degrees of relative motion are afforded by the apparatus 11. The tenth degree of relative motion, in addition to the nine discussed above, is angle Z' which affords the rotation of cut piece handling mechanism 15 about an axis perpendicular to angles A and B, angle Z' having a center of rotation that extends vertically through the point of cut 21. Angle Z' adds or subtracts to or from the angle C and provides increased angular adjustments of the cutting member 19 on the cut piece. This permits smaller or larger angles in addition to the ±45° capability of the cutting member positioning mechanism 17. Johnson, col. 5:3-15.
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> Referring to FIGS. 7 and 9, an alternative embodiment of the cut piece handling mechanism 15 is illustrated which provides an additional axis of rotation about the vertical axis of rotation of angle C, this additional axis of rotation, which forms angle Z, passing through point of cut 21. The additional axis of rotation permits smaller or larger angles of cut in addition to the plus or minus 45° capability of the cutting member positioning mechanism 17. Johnson, col. 7:4-12.

The paragraphs discuss an alternative embodiment that has an added axis of freedom Z` that is "perpendicular to angles A and B" – where angle B is the bevel angle. Johnson at col. 5:3-15.

The specification then states that "Angle Z' adds or subtracts to or from the angle C and provides increased angular adjustments of the cutting member 19 on the cut piece." *Id.* These statements, ignored by the PTO, immediately precede the phrase cited by the Board and the PTO "This permits smaller or larger angles in addition to the ±45° capability of the cutting member positioning mechanism 17." *Id.* This is a prime example of the damage the Federal Circuit warned against in *Brand* when the PTO relies omits own expertise, rather then record evidence, in drawing conclusions.

It is neither opinion nor conjecture (nor rebutted) that the cited phrase has no relevance to the bevel angle, Angle B. It is unrebutted that the cited passage (i) does not relate to Figure 1, and (ii) provide absolutely no indication of what angle bevel cuts can be made by the described device. In fact, if the Board and the PTO had given the Court the courtesy of presenting the text 8 lines down from the cited passage at col. 7 of Johnson, they (the PTO) would have had to concede to the Court that while the short cited portion of text describes the operation of Figs. 7 and 9, the specification specifically describes having to perform an "end swapping operation." (Johnson at col. 7:13-20). End swapping, an operation where the work piece is either flipped or rotated 180°, is an operation inimical to and totally inconsistent with the very notion that the cutting blade can be adjusted to cut ±45° bevel angles. It is incredulous that at this stage of the proceedings the PTO still clings to the Board's erroneous position that Johnson "solve[s] the problem" of making "left and right 45 degree angular cuts, on a work piece without flipping the work piece" when Johnson clearly states that a user must still perform an "end swapping operation" to make bevel cuts in two directions. Exhibit 2 at 9-10; Johnson at col. 7:13-20.

The Board could not have relied on any of the cited passages for its finding that Johnson "solve[s] the problem" of making "left and right 45 degree angular cuts, on a work piece without flipping the work piece." Exhibit 2 at 9-10.

Rather, the Board impermissibly and inexplicably relied on its own expertise and got itself in trouble (again). The only other portion of the record cited by the Board is Figure 1 of Johnson. Of course, unless the Board considered dimensional attributes and/or relative component size to that drawing (which would be legally improper), it had no basis for upholding any rejection based on Johnson. *See Nystrom v. Trex Co.*, 424 F.3d at 1149. Further, plaintiff has clearly demonstrated (and the PTO has not contested in any way) that, even if Figure 1 were to scale, it does not disclose a device that can make ±45° bevel cuts in both directions. Such a conclusion is in fact antithetical to Johnson's specification, which specifically states that "end swapping operation[s]" are still <u>required</u> with the Johnson device. Johnson at col. 7:13-20.

All of this was pointed out to the Board in applicant's request for rehearing. The Board acknowledged that the specification passages cited by the Board, Johnson at col. 5, 1. 14-15; col. 7, 1. 11-12, relate only to Angle C. Exhibit 3 at 3. However, the Board cited one other passage of Johnson, col. 5:49-68 and Figure 3, but only for support for its contention that Johnson is capable of making bevel cuts. This is not in dispute. However, nowhere in this passage is found any reference to the ability to make ±45° bevel cuts (Angle B). Despite the PTO's attempt to salvage the fatally flawed opinion of the Board, the Board itself sums up (the festering defect in) its opinion best, stating that "Johnson's Figure 1 depicts a compound angle disk cutting apparatus which reasonably appears to have both ±45° vertical cutting ability and ±45° horizontal cutting ability because of the vertical and horizontal pivoting capability of cutting member positioning mechanism 17." Exhibit 3 at 2. The Board then states that "[o]ur decision

so found based on Johnson's teaching as a whole, including the configuration of the composite

cutting member 19, motor 41, and drive train 43 in Johnson's Figure 1…" Exhibit 3 at 2-3.

Whether or not the Board also relied on the specification (which, as shown above, would be

impossible), the Board clearly relied on the scale of the drawings to make conclusions regarding

±45° bevel cutting ability.[15]

   Ambrosio is similarly handled by the Board and the PTO. The Board (and now the PTO)

uses only figures to support its finding that Ambrosio discloses a "compound angle disk cutting

apparatus" intended to "solve the problem" of making "left and right 45 degree angular cuts, on a

work piece without flipping the work piece." Exhibit 2 at 9-10. The Board cites, specifically,

"Ambrosio's Figure 1, the composite of blade 10, blade shaft 31, motor means 11, motor shaft 32

and pulleys 29 and 30 relating to saws "for varying the angular position of the saw blade relative

to the work" (Ambrosio at col. 1:8-11)." Exhibit 2 at 10. The only other discussion of Ambrosio

in the Board's opinion contains not a single cite to the specification. Exhibit 2 at 19-20. The

PTO cannot support, from a factual or legal standpoint, the position that the statement "varying

the angular position" discloses the "specific dimensions" recited in the applicant's claims. *See*

*Nystrom v. Trex Co.*, 424 F.3d at 1149. Thus, it becomes apparent that the Board relied solely on

Figure 1 for its conclusions (as it clearly states in its opinion), which is legally improper and

cannot be the basis for upholding the cited rejections. *Id.*

   Finally, the Board (and now the PTO in defending the Board) uses only figures to support

its finding that Langworthy discloses a "compound angle disk cutting apparatus" intended to

"solve the problem" of making "left and right 45 degree angular cuts, on a work piece without

flipping the work piece." Exhibit 2 at 9-10. As its sole support for this contention, the Board

---

[15] The analysis is flawed in any case, as the device of Johnson is, as drawn, incapable of making ±45° bevel
cuts. *See* Plaintiff's Motion at 10-13.

states in its cite "See Langworthy's Figure 1, the composite of disk-type saw 3, motor 1, and driving shaft 2 for "many different styles of incisions or cuts, with the instrument at various angles" (Langworthy, p. 1 at 26-28)." Exhibit 2 at 10. The Board further cites Langworthy at col. 2: 49 – 53, which states "[t]he arm may readily be manipulated to attain cuts at various angles and depths for cranial and other cuts, and the laterally disposed saw affords an instrument which may be manipulated with facility and accuracy in the operations." It is undisputed that the applicant's claims recite specific relative dimensions.[16] It is undisputed that the passages of the specifications contain no reference to any such specific dimensions. Simply, the disclosure of "various angles" cannot be morphed into a disclosure of "left and right 45 degree angular cuts, on a work piece without flipping the work piece." In addition, the PTO ignores entire passages of the Board's decision where it discusses its assumptions based on the Langworthy figures. *See* Exhibit 2 at 18-19. For example, the Board states that "As shown in Langworthy's Figures 2 and 3, the motor shaft is disposed in parallel with and above said saw shaft; and the axis of the motor shaft is connected to the saw shaft so that the axis of the motor shaft is shifted from an axis of said saw shaft by a distance which is greater than the radius of said circular blade." Exhibit 2 at 18. The Board cites no portion of the specification as support for these conclusions. Undeterred by this lack of support, the Board then, states that "[i]t appears that during surgery, when the motor of Langworthy's surgical saw is tilted in either direction by an angle greater than or equal to 45 degrees with respect to the zero tilt angle position, the housing would not contact the top surface of the work piece base." *See* Exhibit 2 at 18-19. No support in the specification is found for this conclusion. It is clear that the Board (1) relied on Figures 1, 2 and 3 which is improper

---

[16] Incredibly, the Board takes the position that whether one of skill in the art would understand or recognize that ±45 beveling was enabled by the relative positioning of the motor and saw blade shafts or by "the relative size and/or configuration of the drive motor and its housing, the cutting member and the work piece base is immaterial". Exhibit 2 at 16-17 (emphasis supplied)

and cannot be the basis for upholding the rejections at issue (see *Nystrom v. Trex Co.*, 424 F.3d

at 1136) and (ii) ignored that the unmounted surgical saw of Langworthy has nothing that would

qualify as a zero tilt angle or top surface of a work piece base against which a motor housing

could bump.

**III.    THE DECLARATIONS WERE INVITED BY VIRTUE OF THE FACT THAT
THE PTO CHOOSE TO PRESENT THIS CASE TO THE COURT VIA A
PREEMPTIVE SUMMARY JUDGMENT MOTION – RATHER THAN FILE AN
ANSWER**

In addition to the fact that the declarations are plainly permitted as part of a § 145 review,

Defendants invited this additional evidence by filing a Motion for Summary Judgment instead of

an Answer.[17]  Summary judgment is only appropriate where there is no genuine issue of material

fact. *See* Fed. R. Civ. P. 56.  A party opposing summary judgment "may not rely merely on

allegations or denials in its own pleading; rather, its response must—by affidavits or otherwise

provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P.

56(e).  The non-moving party must do more than "show that there is some metaphysical doubt as

to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574

(1986).  The 4 disputed declarations (which provide evidence Hitachi would be permitted to

introduce in its § 145 appeal in any event) demonstrate disputed facts, consistent with the nature

of what is expected in an opposition to a summary judgment motion under the Federal Rules of

Civil Procedure.  Defendant should not now be permitted to complain about submission of

---

[17] Prior to the filing of defendant PTO's summary judgment motion, Hitachi's counsel contacted the PTO,
informed the PTO that Hitachi would be putting expert testimony into evidence and proposed an agreed joint
scheduling order intended to provide each party with a brief discovery period to be followed by dispositive
motions.  Rather than proceed in such a fashion, the PTO chose to file its immediate summary judgment
motion (without even filing an Answer).  Having made that tactical decision (thereby inviting Hitachi to
present factual disputes), the PTO now complains about Hitachi putting forward evidence that it is unable to
dispute!

evidence of these additional facts, when its decision to file a Motion for Summary Judgment invited Hitachi to identify factual disputes.

Although under § 145 Hitachi has a right to submit its evidence to this Court, in this instance Hitachi was invited to do so at this early stage to demonstrate a factual dispute necessary to defeat the PTO's Summary Judgment motion. Moreover after filing its opposition to the PTO's motion (and prior to filing its own Summary Judgment motion), Hitachi (again) offered the PTO (through its counsel) the opportunity to cross examine the declarations. Specifically, Hitachi contacted the PTO's counsel and offered to set a deposition schedule for that purpose. Defendant declined, making yet another tactical choice. This time the PTO chose to rely solely on procedural objections to Hitachi's opposition to the PTO's summary judgment motion and to Hitachi's summary judgment motion, even though the latter is based on the same evidence the PTO invited by submission of its pre-emptive summary judgment motion. Simply put, after filing its own summary judgment motion (incorrectly) insisting that there were no factual disputes, the PTO now refuses to even admit or deny facts presented to it. Rather, ostrich-like, the PTO insists on sticking its figurative head in the sand ignoring any unpleasant facts (or factual disputes) that might be swirling about. *See* Def's Resp. to Plaintiff's Statement of Material Facts not in Dispute.

## IV. ALL OF THE CLAIMS SHOULD BE CONSIDERED IN THE PROCEEDING

On a purely equitable basis, the Court should consider all of the patent claims in the appeal. The PTO's refusal to abide by its own "compact prosecution" rules (see note 8, supra) forced Hitachi into the untenable position of permitting the PTO to extend the reissue proceeding interminably or proceed to an admittedly premature appeal, i.e., to escape the clutches of a rogue examiner. Hoping for a fast resolution of the appeal, Hitachi asked the Board to focus on claim 1, which had remained unchanged throughout the long PTO proceeding. Even with that "for the

benefit of the Board" concession (intended to reduce the pendency time for the appeal), the appeal remained pending for close to two years and of course resulted in an adverse ruling. In any event, Hitachi now appeals to this court in equity to permit the present § 145 appeal to proceed on all pending claims.

In this regard, Hitachi further notes that in the PTO appeal the examiner did put before the Board all of the pending claims. In his Examiner's Answer (Attachment E) (the "last word" in the appeal and filed in response to Hitachi's Brief on Appeal) the Examiner again discusses Langworthy and Ambrosio, stating that "these patents *were only mentioned* to cover some features of the dependent claims. Since Appellant has stated that all claims stand or fall with claim 1, there is not much point in arguing about Langworthy or Ambrosio." Examiner's Answer at 15. After so stating, the Examiner proceeds to <u>substantively</u> discuss those references. Examiner's Answer at 5, 7 and 9-10. Thus, the PTO itself put forward (to the Board) a case on all claims. The Board then specifically cited <u>all the pending claims</u> in its decisions.

## CONCLUSION

For the reasons set forth above and in Hitachi's opening motion, Hitachi's motion for summary judgment should be granted.

Dated:  April 17, 2008                    Respectfully Submitted,

Paul Devinsky (D.C. Bar No. 250373)
Michael Connelly (D.C. Bar No. 495872)
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C.  20005-3096
Telephone:  202.756.8000

*Attorneys for Plaintiff*
*Hitachi Koki Co., Ltd.*

WDC99 1556572-1.033065.0025

**CERTIFICATE OF SERVICE**

     **I HEREBY CERTIFY** that on this 17th day of April, 2008, a copy of the foregoing PLAINTIFF HITACHI KOKI CO., LTD'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT was served by first class mail, postage prepaid on the following:

     Michelle N. Johnson, Esquire
     Assistant United States Attorney
     Civil Division
     555 4th Street, N.W., Room E4212
     Washington, D.C.  20530

     Stephen Walsh, Esquire
     Acting Solicitor
     United States Patent and Trademark Office
     Post Office Box 15667
     Arlington, Virginia  22218

Dated: April 17, 2008

                            Respectfully Submitted,

                            Paul Devinsky  (D.C. Bar No. 250373)
                            McDermott Will & Emery LLP
                            600 Thirteenth Street, N.W.
                            Washington, D.C.  20005-3096
                            Telephone:  202.756.8000

                            *Attorneys for Plaintiff*
                            *Hitachi Koki Co., Ltd.*

# ATTACHMENT A

# Manual of PATENT EXAMINING PROCEDURE

Original Eighth Edition, August 2001
Latest Revision September 2007



## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

Rev. 6, Sept. 2007

The U.S. Patent and Trademark Office does not handle the sale of the Manual, distribution of notices and revisions, or change of address of those on the subscription list. Correspondence relating to existing subscriptions should be sent to the Superintendent of Documents at the following address:

> Superintendent of Documents                Telephone:   202-512-2267
> Mail List Section
> Washington, DC 20402

Inquiries relating to purchasing the Manual should be directed to:

> Superintendent of Documents                Telephone:   202-512-1800
> United States Government Printing Office
> Washington, DC 20402

Orders for reproduced copies of individual replacement pages or of previous revisions of the Manual should be sent to the following address:

> Mail Stop Document Services                Telephone:   1-800-972-6382 or 571-272-3150
> Director of the U.S. Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22313-1450

Previous editions and revisions of the Manual are available on microfilm in the Patent Search Room. The Manual is available on CD-ROM and on diskette from:

> U.S. Patent and Trademark Office            Telephone:   571-272-5600
> Office of Electronic Information Products
> MDW 4C18, P.O. Box 1450
> Alexandria, VA 22313-1450

Employees of the U.S. Patent and Trademark Office should direct their requests for the Manual, replacement pages, notices, and revisions to the Office of Patent Training.                Telephone:   571-272-7222

Pursuant to the Patent and Trademark Office Efficiency Act (PTOEA) (Pub. L. 106-113, 113 Stat. 1501A-572), the head of the United States Patent and Trademark Office (USPTO) is the "Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office." The Director is assisted by the "Deputy Under Secretary of Commerce for Intellectual Property and Deputy Director of the United States Patent and Trademark Office." The patent operations of the USPTO are now headed by the "Commissioner for Patents." The trademark operations of the USPTO are now headed by the "Commissioner for Trademarks." Under section 4741(b) of the PTOEA, any reference to the Commissioner of Patents and Trademarks, the Assistant Commissioner for Patents, or the Assistant Commissioner for Trademarks is deemed to refer to the Director, the Commissioner for Patents, or the Commissioner for Trademarks, respectively. See "Reestablishment of the Patent and Trademark Office as the United States Patent and Trademark Office" published in the *Federal Register* at 65 FR 17858 (Apr. 5, 2000), and in the *Official Gazette of the United States Patent and Trademark Office* at 1234 O.G. 41 (May 9, 2000).

Additions to the text of the Manual are indicated by arrows (><) inserted in the text.   Deletions are indicated by a single asterisk (*) where a single word was deleted and by two asterisks (**) where more than one word was deleted. The use of three or five asterisks in the body of the laws, rules, treaties, and administrative instructions indicates a portion of the law, rule, treaty, or administrative instruction which was not reproduced.

> First Edition, November 1949
> Second Edition, November 1953
> Third Edition, November 1961
> Fourth Edition, June 1979
> Fifth Edition, August 1983
> Sixth Edition, January 1995
> Seventh Edition, July 1998
> Eighth Edition, August 2001
>   Revision 1, February 2003
>   Revision 2, May 2004
>   Revision 3, August 2005
>   Revision 4, October 2005
>   Revision 5, August 2006
>   Revision 6, September 2007

In the event of a dismissal for a reason other than failure to prosecute the appeal, the status of the application, reexamination proceeding or interference must be determined according to the circumstances leading to the dismissal.

## 1216.02   Civil Suits Under 35 U.S.C. 145 [R-3]

A 35 U.S.C. 145 civil action is commenced by filing a complaint in the U.S. District Court for the District of Columbia within the time specified in 37 CFR 1.304 (see MPEP § 1216). Furthermore, copies of the complaint and summons must be served in a timely manner on the Solicitor, the U.S. Attorney for the District of Columbia, and the Attorney General in the manner set forth in Rule 4(i) of the Federal Rules of Civil Procedure. Regarding timely service, see *Walsdorf v. Comm'r*, 229 USPQ 559 (D.D.C. 1986) and *Hodge v. Rostker*, 501 F. Supp. 332 (D.D.C. 1980). When a 35 U.S.C. 145 civil action is filed, a notice thereof is placed in the application or reexamination file, which ordinarily will be kept in the Solicitor's Office pending termination of the civil action. >All the expenses of the proceedings shall be paid by the applicant (see 35 U.S.C. 145).<

In an action under 35 U.S.C. 145, the plaintiff may introduce evidence not previously presented to the U.S. Patent and Trademark Office. However, plaintiff will be precluded from presenting new issues, at least in the absence of some reason of justice put forward for failure to present the issue to the U.S. Patent and Trademark Office. *DeSeversky v. Brenner*, 424 F.2d 857, 858, 164 USPQ 495, 496 (D.C. Cir. 1970); *MacKay v. Quigg*, 641 F. Supp. 567, 570, 231 USPQ 907, 908 (D.D.C. 1986). Furthermore, new evidence is not admissible in district court where it was available to the parties but was withheld from the U.S. Patent and Trademark Office as a result of fraud, bad faith, or gross negligence. *DeSeversky*, 424 F.2d at 858 n.5, 164 USPQ at 496 n.5; *California Research Corp. v. Ladd*, 356 F.2d 813, 821 n.18, 148 USPQ 404, 473 n.18 (D.C. Cir. 1966); *MacKay*, 641 F. Supp. at 570, 231 USPQ at 908; *Monsanto Company v. Kamp*, 269 F. Supp. 818, 822, 154 USPQ 259, 260 (D.D.C. 1967); *Killian v. Watson*, 121 USPQ 507, 507 (D.D.C. 1958).

Upon termination of the civil action, a statement of the court's final disposition of the case is placed in the application or reexamination file, which is then returned to the examiner for action in accordance with the same procedures as follow termination of a 35 U.S.C. 141 appeal. See MPEP § 1216.01. 37 CFR 1.197(*>b<) provides that a civil action is terminated when the time to appeal the judgment expires. Where the exact date when the civil action was terminated is material, the date may be ascertained from the Solicitor's Office.

The procedures to be followed in the U.S. Patent and Trademark Office after a decision, remand, or dismissal of the case by the district court are the same as the procedures followed with respect to 35 U.S.C. 141 appeals. See MPEP § 1216.01.

Where a civil action involving an application has been dismissed before coming to trial, the application will not be opened to the public unless it is otherwise available to the public under 37 CFR 1.11. However, the complaint and any other court papers not under a protective order are open to the public and may be inspected at the Office of the Clerk for the U.S. District Court for the District of Columbia, located in the U.S. Courthouse, 333 Constitution Avenue, N.W., Washington, DC 20001. The court papers in the Office of the Solicitor are not generally made available for public inspection.

Any subpoena by the district court for an application or reexamination file should be hand-carried to the Office of the Solicitor.

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

Rev. 3, August 2005

# ATTACHMENT B

Westlaw.

Slip Copy
Slip Copy, 2005 WL 5569663 (D.D.C.)
(Cite as: Slip Copy, 2005 WL 5569663)

Page 1

**H**Hyatt v. Dudas
D.D.C.,2005.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Gilbert P. HYATT, Plaintiff,
v.
Jon W. DUDAS, Under Secretary of Commerce for
Intellectual Property and Director of the United
States Patent and Trademark Office, Defendant.
Civil Action No. 03-0901(HHK).

Sept. 30, 2005.

Michael I. Coe, Crowell & Morning LLP,
Washington, DC, for Plaintiff.
David J. Ball, Jr., Weil, Gotshal & Manges, LLP,
New York, NY, Rhonda C. Fields, United States
Attorney's Office, Washington, DC, for Defendant.
Wilma A. Lewis, Crowell & Morning LLP,
Washington, DC.

**MEMORANDUM OPINION**

HENRY H. KENNEDY, JR., United States District
Judge.
*1 Plaintiff, Gilbert P. Hyatt ("Hyatt"), brings this
action against defendant, Jon W. Dudas,[FN1] in his
official capacity as Director of the United States
Patent and Trademark Office ("PTO"), seeking
review of the decision of the Board of Patent Appeals
and Interferences ("Board") to affirm the rejection of
79 of the 117 claims in Hyatt's patent application.
Before the court are the parties' cross-motions for
summary judgment [23, 24]. Upon consideration of
the motions, the respective oppositions thereto, and
the record of this case, the court concludes that the
PTO's motion for summary judgment must be
granted, and Hyatt's partial motion for summary
judgment must be denied as moot.

> FN1. Jon Dudas became the Director of the
> United States Patent and Trademark Office
> in 2004. When Hyatt initially filed his
> complaint on April 16, 2003, James Rogan
> held this position. Pursuant to FED. R. CIV.
> P. 25(d)(1), the court has substituted Dudas
> for Rogan as the defendant in this lawsuit.

**I. BACKGROUND**

**A. Legal Background**

**1. Patent Applications**

An inventor seeking to obtain a patent must file a
specification of the purported invention with the
PTO. 37 C.F.R. § 1.51(b)(1). A specification must
include, inter alia, both a written description of the
invention and an enablement for a claimed invention
which explains the "manner and process of making
and using [the invention], in such full, clear, concise,
and exact terms as to enable any person skilled in the
art to which it pertains ... to make and use the
same...."35 U.S.C. § 112 para. 1; see also37 C.F.R. §
1.71(a).

To fulfill the written description requirement, a
patent applicant must "convey with reasonable clarity
to those skilled in the art that, as of the filing date
sought, he or she was in possession *of the
invention."Vas-Cath, Inc. v. Mahurkar, 935 F .2d
1555, 1563-64 (Fed.Cir.1991)*. That is, a description
need not describe exactly what that applicant claims
as her invention, but it must convey to one with
"ordinary skill in the art" that the applicant invented
what is claimed. *See Union Oil Co. of Cal. v. ARCO,
208 F.3d 989, 997 (Fed.Cir.2000)*. A disclosure may
meet this burden by providing either "express" or
"inherent" support for a claimed limitation. *See
Tronzo v. Biomet, Inc., 156 F.3d 1154, 1159
(Fed.Cir.1998)*. In order for a disclosure to be
inherent, the "missing descriptive matter must
necessarily be present in the ... application's
specification such that one skilled in the art would
recognize such a disclosure."*Id.*

To fulfill the enablement requirement, "a patent
application must adequately disclose the claimed
invention so as to enable a person skilled in the art to
practice the invention at the time the application was
filed without undue experimentation."*In re Swartz,
232 F.3d 862, 863 (Fed.Cir.2000)* (internal citation
omitted)."[A] 'reasonable' amount of routine
experimentation," is allowed but "such

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

experimentation must not be 'undue.' " *Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1371 (Fed.Cir.1999). In addition, "[w]hether claims are sufficiently enabled by a disclosure in a specification is determined as of the date that the patent application was first filed." *Id.*

**\*2** At the end of the written description and enablement, a proper specification should conclude with a list of "claims," which identify the specific innovations, components or sub-parts of invention, the applicant regards as hers. 35 U.S.C. § 112 para 2. A claim is a single sentence description, usually divided into several paragraphs, of what an applicant believes to be her invention, setting the boundaries of the invention the applicant wishes the PTO to examine. Specifically, a single claim can be composed of multiple elements and/or limitations. Elements are the previously known physical components that make up the claimed invention. Limitations, on the other hand, usually describe the claim's restrictions, the interaction between or features of the claim's elements. An application may contain several claims, and each claim usually contains several limitations. In addition, several claims in a single application may share some of the same limitations. As a result, the PTO may reject several claims at once by rejecting a single, shared limitation.

**2. Patent Process and Review**

After an inventor files her application, which typically includes a specification, drawings, and sets of claims, to the PTO, the PTO submits the application to an Examiner with the necessary technical competence. *In re Berg,* 320 F.3d 1310, 1315 (Fed.Cir.2003). After examining the application, the Examiner sends the applicant an "Office action" which may grant or reject the claims. 37 C.F.R § 1.104(a)(2). The applicant may respond by submitting, in writing, a reply that "distinctly and specifically points out the supposed errors in the examiner's action and must reply to every ground of objection and rejection in the prior Office action."*Id.* § 1.111(b)."A general allegation that the claims define a patentable invention without specifically pointing out how the language of the claims patentably distinguishes them from the references does not comply with the requirements of this section."*Id.* If and when the Examiner and applicant

finally cannot agree on the disposition of certain claims, the Examiner issues a Final Office Action. *Id.* § 1.113. The applicant then may appeal to the Board, made up of a panel of three administrative patent judges ("APJs"), which will either sustain or reverse the Examiner's rejections. 35 U.S.C. § 134(a). If the Board sustains the Examiner's rejections, the applicant may appeal to the Federal Circuit under 35 U.S.C. § 141, or she may bring a civil action to overturn the Board's decision in this court under 35 U.S.C. § 145.

**B. Factual Background**

Hyatt is an electrical engineer who holds various computer hardware and software patents. The application at issue is U.S. Patent Application Serial No. 08/471,702 ("'702 Application" or "'702"), entitled "Improved Memory Architecture Having A Multiple Buffer Output Arrangement," which relates to a computerized display system for processing images. R3, 1584.

**\*3** On June 6, 1995, Hyatt filed the '702 Application, which included a 238-page specification, 40 pages of drawings, and 15 claimed inventions. R1-347. After several amendments, Hyatt presented 117 claims for examination. Hyatt's specification indicates that the '702 application is part of a continuation of ancestor patents dating back to 1984. R4. The specification lists certain computer components, including a graphics processor, a register interface, a buffer memory, and a post-processor. The specification describes certain techniques, such as spatial filtering for anti-aliasing, and some software programs. *See* R1599-1600.

The Examiner rejected all 117 claims on various grounds. *See* R638-63. The Board affirmed the Examiner's rejections of 79 of Hyatt's claims [FN2] and overturned other rejections, which are not part of the present action. *See* R1583-1640. The Board affirmed the rejection of each of the 79 claims for lack of written description and/or lack of enablement. R1639. On April 16, 2003, Hyatt filed a complaint in this court pursuant to 35 U.S.C. § 145.

> FN2. The Board upheld the rejection of claims 1-14, 17, 18, 20, 34, 36, 42-45, 81, 85, 98, 106-114, 116, 119-134, 136, 141, 143, 145-48, and 153-72 for lack of written

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3
Slip Copy, 2005 WL 5569663 (D.D.C.)
(Cite as: Slip Copy, 2005 WL 5569663)

description and lack of enablement. R1639.

## II. ANALYSIS

### A. Procedural issues

The PTO brings a motion for summary judgment, and Hyatt brings a motion for partial summary judgment, under FED. R. CIV. P. 56.[FN3] The parties, however, dispute several threshold issues of law which this court must resolve before turning to the merits of the motions. in this case. Specifically, the court must determine: (1) the deference, if any, owed to the decision of the Board in a district court review under Section 145; (2) the value of inventor testimony or declarations as evidence; and (3) the application of the administrative exhaustion requirement to certain arguments in this case. The court examines each in turn.

> FN3. Under FED.R.CIV.P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

### 1. Standard of Review-Section 145

The parties disagree over the court's standard of review of the Board's decision to reject Hyatt's patent application. The PTO argues that in a case under 35 U.S.C. § 145, all of the Board's fact-findings are entitled to "substantial evidence" deference, whether or not the patent applicant introduces new evidence as Section 145 allows her to do. Hyatt, on the other hand, contends that the Board's fact-findings are reviewed *de novo* if additional evidence is submitted that rebuts those findings. Hyatt is correct.

Section 145 provides that the district court "may adjudge that such applicant is entitled to receive a patent for an invention, as specified in any of his claims involved in the decision of the [Board]." 35 U.S.C. § 145. The Federal Circuit recognized that

Section 145 is, in essence, a type of review of administrative action, and therefore the district court must employ a "standard of review for error in [an] agency decision." *Fregeau v. Mossinghoff,* 776 F.2d 1034, 1038 (Fed.Cir.1985). As a result, a district court normally applies the deferential "substantial evidence" standard to the Board's fact-findings. *Mazzari v. Rogan,* 323 F.3d 1000, 1004-05 (Fed.Cir.2003) (citing *Dickinson v.. Zurko,* 527 U.S. 150 (1999)) (holding that the Administrative Procedure Act, 5 U.S.C. § 706, applies to a court's review of PTO decisions). However, section 145 is not merely a form of administrative review. The statute allows the parties to submit new evidence to be considered by the court in addition to the administrative record before the Examiner and the Board. *See Fregeau,* 776 F.2d at 1037 ("The proceeding [under Section 145], however, is not simply an appeal since the parties are entitled to submit additional evidence."); *Mazzari,* 323 F.3d at 1004 (holding that section 145 "affords the applicant an opportunity to present additional evidence or argue the previous evidence afresh, either by simply relying upon the record below or by reintroducing the same evidence through alternative means such as live testimony"). If new evidence is submitted, "the district court takes on the role of fact-finder and may need to make factual findings." *Id.* Proceedings under Section 145 have therefore been described as "a hybrid of an appeal and a trial de novo." *Winner Int'l Royalty Corp. v. Wang,* 202 F.3d 1340, 1345 (Fed.Cir.2000) (citing *Estee Lauder Inc. v. L'Oreal, S.A.,* 129 F .3d 588, 592 (Fed.Cir.1997)). This is because the district court "applies the 'substantial evidence' standard of review to findings of fact made by the board," but it makes "de novo factual findings" if the parties present additional conflicting evidence. *Mazzari,* 323 F.3d at 1005. Therefore, the court reviews the Board's fact-findings *de novo* to the extent that Hyatt presents new evidence that challenges particular findings; otherwise, when no such evidence is presented, the court employs a deferential "substantial evidence" standard.

### 2. Admissibility of Hyatt's Declaration

**\*4** Hyatt presents a declaration which refutes the Board's various written description rejections. *See generally* R832. Such a declaration would entitle Hyatt to *de novo* review of every fact-finding of the Board he challenged. *Mazzari,* 323 F.3d at 1005.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 5569663 (D.D.C.)
(Cite as: Slip Copy, 2005 WL 5569663)

Page 4

However, the PTO argues that despite Hyatt's apparent entitlement to submit new evidence under Section 145, the court should not consider Hyatt's declaration-causing the Board's fact-findings to be reviewed under a deferential standard-for two reasons. First, the PTO argues that the declaration of a patent applicant in his own case is not entitled to any weight. Second, the PTO contends that Hyatt's declaration should not be considered because he does not explain his failure to submit the declaration in previous proceedings before the Board. The court considers both arguments in turn and ultimately concludes that it cannot consider Hyatt's declaration.

*a. Validity of Inventor Testimony*

The PTO argues that the court should not consider Hyatt's declaration because "the bald declaration of an inventor is insufficient to overcome the Board's findings."Def.'s Reply to Pl .'s Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Reply") at 11 (citing *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys., 132 F.3d 701, 706 (Fed.Cir.1997); Roton Barrier, Inc. v. Stanley Works, 79 F.3d 1112, 1126 (Fed.Cir.1996)*). The PTO is incorrect because it misreads the law.

A court may not consider an inventor's declaration in disputes involving claim construction, which by definition only takes place *after* a patent has been granted. *See Bell & Howell,* 132 F.3d at 706 (noting that, in claim construction, after-the-fact inventor declarations must be disregarded because "the claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, on account on which the public is entitled to rely") (quoting *Vitronics Corp. v.. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed.Cir.1996)); *Roton Barrier,* 79 F.3d at 1125-26 (disregarding inventor declaration in resolving dispute over claim construction in infringement case). By contrast, it is well-established that *before* a patent has been granted, an inventor's testimony may be used to determine whether claims meet the written description requirement. *See Solomon v. Kimberly-Clark Corp.,* 216 F.3d 1372, 1378 (Fed.Cir.2000) ("[I] n the more fluid environment of patent examination, an inventor's statements are relevant to determining compliance with the statute."); *see also id.*("It is not inappropriate for the PTO *or a reviewing tribunal* to consider such evidence extrinsic to the

patent application in light of the goals of the examination process and the fact that pending claims can be freely amended to comport with those goals.") (emphasis added) (citing *In re Zletz,* 893 F.2d 319, 321-22 (Fed.Cir.1989)). The court, therefore, will not refuse to consider Hyatt's declaration simply because it is his own self-serving testimony.

*b. Failure to Submit Declaration in Previous Proceedings*

*5 The PTO argues that the court should not consider Hyatt's declaration because he failed to present it in the proceedings before the Examiner and the Board. The merits of this argument in turn rests on the validity rests of two other assertions: first, that there are limitations to a party's entitlement to submit new evidence under Section 145 and, second, that under these limitations, Hyatt is not entitled to submit his declaration. The court agrees with the PTO on both counts.

First, while Hyatt argues that there are no restrictions to submitting new evidence under Section 145, courts in the District of Columbia have established a doctrine limiting this entitlement. The courts in such actions refuse to admit evidence submitted to support "new" arguments-that is, those not raised before the Examiner or the Board. *DeSeversky v. Brenner,* 424 F.2d 857, 858 (D.C.Cir.1970) (stating that though an applicant may present new evidence, she is "precluded from presenting new issues, at least in the absence of some reason of justice put forward for failure to present the issue to the Patent Office"); *see also In re Watts,* 354 F.3d 1362, 1367 (Fed.Cir.2004) ( "[I]t is important that the applicant challenging a decision not be permitted to raise arguments on appeal that were not presented to the Board."). In addition, courts have excluded new evidence in Section 145 actions if it was "available to the parties, but was withheld from the Patent Office as a result of fraud, bad faith, or gross negligence."*Monsanto Co. v. Kamp,* 269 F.Supp. 818, 822 (D.D.C.1967); *accord Cal. Research Corp. v. Ladd,* 356 F.2d 813, 820-21 n. 18 (D.C.Cir.1966) ("Although each side 'may strengthen its case with additional material' the plaintiff may not submit for the first time evidence which he was negligent in failing to submit to the Patent Office...."); *Holloway v. Quigg,* 9 U.S.P.Q.2d 1751, 1752 (D.D.C.1988) ( "[E]vidence has been excluded if it was available to the plaintiff during the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PTO proceeding but was either intentionally or negligently withheld."). Both doctrines support the "general policy of encouraging full disclosure to administrative tribunals." *Ladd,* 356 F.2d at 820-21 n. 18 ("In short, the District Court proceeding may not be conducted in disregard of the general policy of encouraging full disclosure to administrative tribunals...."). Consequently, these doctrines limit Hyatt's entitlement to submit new evidence under Section 145.[FN4]

> FN4. The Federal Circuit, which provides the controlling law in this case, has neither accepted nor repudiated cases, such as *DeSeversky* or *Kamp,* limiting the entitlement to submit new evidence in Section 145 actions. Nevertheless, the PTO has adopted these guidelines, citing explicitly to D.C. Circuit and D.C. district court cases:
>
> > In an action under 35 U.S.C. [§ ] 145, the plaintiff may introduce evidence not previously presented to the U.S. Patent and Trademark Office. However, plaintiff will be precluded from presenting new issues, at least in the absence of some reason of justice put forward for failure to present the issue to the U.S. Patent and Trademark Office. [Citations to *DeSeversky,* 424 F.2d at 858;*MacKay,* 641 F.Supp. at 570]. Furthermore, new evidence is not admissible in district court where it was available to the parties but was withheld from the U.S. Patent and Trademark Office as a result of fraud, bad faith, or gross negligence. [Citations to *DeSeversky,* 424 F.2d at 858 n. 5;*Ladd,* 356 F.2d at 821 n. 18;*MacKay,* 641 F.Supp. at 570;*Kamp,* 269 F.Supp. at 822;*Killian v. Watson,* 121 U.S.P.Q. 507, 507 (D.D.C.1958) ].
>
> MANUAL ON PATENT EXAMINING PROC. § 1216.02.

Second, the PTO argues that under these doctrines, Hyatt should be barred from submitting his declaration. Specifically, the PTO contends that Hyatt is at least negligent in failing to provide the declaration in earlier proceedings. Def.'s Mot. for

Summ. J. ("Def .'s Mot.") at 37. Hyatt, on the other hand, justifies submitting his declaration because he had no opportunity to respond to the Board's new grounds for upholding the Examiner's written description rejections. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 41-44. The PTO's position has merit and Hyatt's does not.

*6 A patent applicant must have the opportunity to respond to new grounds for claim rejections put forth by the Board. *See In re Waymouth,* 486 F.2d 1058, 1061 (CCPA 1973) ("To attempt to deny appellants an opportunity to provide a different and appropriate response to the board's rejection ... does not satisfy the administrative due process established by Rule 196(b) of the Patent Office."). If the Board provides a "wholly different basis" for sustaining a rejection, the rejection is new. *Id.* at 1060-61 (finding that the Board had sustained a rejection on a "wholly different basis" and had conceded as much by admitting that its comments "were merely 'an additional reason' for affirming the examiner's rejection"). However, a rejection is not based on new grounds if "appellants have had fair opportunity to react to the thrust of the rejection." *In re Kronig,* 539 F.2d 1300, 1302 (CCPA 1976); *accord id.* at 1303 (finding that an applicant had fair opportunity to challenge a rejection because "[t]he basic thrust of the rejection at the examiner and board level was the same").

Hyatt faults the Board for not directly quoting the Examiner's written description rejections. *See, e.g.,* Pl.'s Opp'n at 18 ("The PTO's failure to quote the precise language used by the Examiner is telling."). By this logic, the Board could only avoid raising a new grounds of rejection by using the exact words the Examiner used to sustain a written description rejection. Though a patent applicant is entitled to respond to the "thrust of the rejection," *Kronig,* 539 F.2d at 1302, not every new turn of phrase by the Board entitles a patent applicant to an additional response. A rejection is not new simply because the Board fails to use the exact words of the Examiner in sustaining a rejection or if the Board simply elaborates on the Examiner's rationale. *In re Oetiker,* 977 F.2d 1443, 1445-46 (Fed.Cir.1992).

After closely comparing the Examiner's rejections with the Board's rejections, [FN5] the court concludes that the "thrust" of the Board's written description

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 6
Slip Copy, 2005 WL 5569663 (D.D.C.)
**(Cite as: Slip Copy, 2005 WL 5569663)**

rejections are the same as those of the Examiner.<sup>FN6</sup> With regard to each limitation rejected for lack of written description, the Examiner identified the specific limitation using a short phrase,<sup>FN7</sup> and explained simply that that particular feature was not described in Hyatt's specification or a parent application (No. 06/662,211) cited by Hyatt.<sup>FN8</sup>

> FN5. *Compare* R642-43 (Examiner's rejection of written description of vector processor) *with* R1605-07 (Board's sustaining same written description rejection); *compare* R643-44 *with* R1608-09 (processor responsive to an accessed block of video pixel image information); *compare* R647 *with* R1613-14 (rejections of block processor generating two dimensional processed image information); *compare* R651 *with* R1615-16 (rejections of block boundary smoothing); *compare* R652 *with* R1617 (written description rejections video image date compression system); *compare* R653 *with* R1617-19 (written description rejections of weighting processor is a quantization weighting processor); *compare* R654 *with* R1620-21 (written description rejections of generating data compressed video information).

> FN6. There is one exception. For claims 153-172, "making a product in response to image information," the Examiner issued a rejection on the grounds that it was not described in Hyatt's specification. R655. Upon review, the Board went beyond simply elaborating on the Examiner's rejection or explaining its own attempts to find the "making a product" feature in the specification. It found that the limitation produced "signals" and that, as a matter of law, "signals" were not "products." R1621-1624. However, the Board made this determination in response to Hyatt's argument in his appeal brief that a "product" could be a "signal." R836-37. It is therefore not a "new" grounds for rejection because Hyatt had and took the opportunity to argue his position. In addition, in his opposition to the PTO's motion for summary judgment, Hyatt does not contend that the Board

provided new grounds for rejection for these claims. Pl.'s Opp'n at 39-40.

> FN7. R642-43 ("vector processor responsive to an accessed block of video pixel image information and to vector information"); R643-44 ("processor responsive to an accessed block of video pixel image information"); R647 ("block processor responsive to an accessed block of pixel image information and to vector information"); R651 ("block boundary smoothing"); R652 ("video image data compression system"); R653 ("weighting processor is a quantization weighting processor"); R654 ("generating data compressed video information").

> FN8. Because the Examiner's rejections were terse-for these limitations, no more than a paragraph each-Hyatt claims that the Examiner did not meet his *prima facie* burden. The controlling law, however, indicates otherwise. If an Examiner simply cannot find a claimed limitation described in a specification, he is not required to say more than that to reject a claim for lack of written description. *In re Alton,* 76 F.3d 1168, 1175 (Fed.Cir.1996) ("If the applicant claims embodiments of the invention that are completely outside the scope of the specification, then the examiner or Board need only establish this fact to make out a prima facie case.") (citing *In re Wertheim,* 541 F.2d 257, 263-64 (CCPA 1976)).

The Board reversed 38 of the Examiner's rejections based on lack of written description. R1639 (reversing Examiner's written description rejection of limitations common to claims 19, 22-25, 35, 37, 49-52, 82-84, 95-97, 99-105, 115, 117, 118, 135, 137-140, 142, 144, and 149-152 because the particular features were described in the specification). However, the Board sustained the remaining rejections using the same rationale-the claimed features were simply not described in Hyatt's specification.<sup>FN9</sup>

> FN9. *See* R1607 ("[W]e find no written description for a processor coupled to and performing the 'generating' function 'in

Slip Copy
Slip Copy, 2005 WL 5569663 (D.D.C.)
(Cite as: Slip Copy, 2005 WL 5569663)

response to' the vector information as well as 'in response to' image information from the image memory"); R1613 (citing R1607 and sustaining similar written description rejection); R1608 ("[W]e find no disclosure of the processor 'generating data compressed video image information,' as claimed"); R1609, R1617, R1620 (citing R1608 and sustaining similar written description rejections); R1616 ("We find nothing in the specification that describes 'smoothing' or 'block boundary smoothing.' "); R1619 ("[W]e fail to see how the program GRAPH.ASC, or the other programs LD.ASC or FTR.ASC, provide written description support for the limitation at issue.").

Mostly, the Board's rejections were longer than the Examiner's. The majority of the Examiner's written description rejections were one paragraph long, see, e.g., R642-43, while the Board at times took several pages to uphold the same rejections. *See, e.g.,* R1605-07. With some rejected written descriptions, the Board did not expand much on the Examiner's one paragraph rejection, using only slightly different words to say that it could not find the claimed limitations in Hyatt's specification. *See, e.g.,* R1608, R1609, R1617. With other rejections, the Board described its attempts to find certain limitations in Hyatt's specification-for instance, by searching the specification for individual words or features in the limitation-and then noting that it still could not find written description support for the claimed limitation as a whole.[FN10]In short, the Board showed that it made an independent and thorough assessment of Hyatt's specification before upholding the Examiner's written description rejections for certain limitations. Furthermore, Hyatt already had a chance to respond to the "thrust" of the Examiner's written description rejections before his appeal to the board. As a result, the court concludes that Hyatt's declaration, which addresses many of the written description rejections, could have been presented earlier, perhaps during Hyatt's proceedings before the Examiner, but certainly by the time his patent application was considered by the Board.[FN11]

FN10.*See, e.g.,* R1605-07 (observing that, with regard to the "vector processor generating two dimensional vector

processed image information" limitation, Hyatt's specification disclosed a processor, coupled to the accessing circuit and to the vector generator, but not one functioning "in response to" vector information and image information from the image memory); R1615 (noting that, for the "block boundary smoothing" limitation, the Board knew what a "block boundary" was, and that a software program in Hyatt's specification included the word "smoothing," but that neither "smoothing" nor the combined phrase "block boundary smoothing" was otherwise described in the specification).

FN11. Hyatt also argues that the Board improperly refused to consider his request for rehearing; however, if a patent applicant fails to present an argument in her appeal to the Board that could have been presented earlier, she may not present it in her request for rehearing. *Cooper v. Goldfarb,* 154 F.3d 1321, 1331 (Fed.Cir .1998) ("A party cannot wait until after the Board has rendered an adverse decision and then present new arguments in a request for reconsideration."). In Hyatt's request for rehearing, he presented 50 pages of new argument, which at last included detailed explanations addressing the Board's reasons for rejecting his claims. R1648-98. In addition, he submitted almost 100 pages of new photographs, drawings, and reference material that he also failed to present earlier to the Board. R1699-1793. The Board denied Hyatt's request for rehearing because his "extensive new arguments" could have been presented earlier. R1807. Upon review of Hyatt's request for rehearing, the court agrees. Hyatt has not offered any justifiable excuse for not submitting these arguments to the Board earlier. As such, Hyatt's request for rehearing was properly denied.

*7 The court, therefore, excludes from its consideration Hyatt's declaration because: (1) the "thrust" of the Board's written description rejections were the same as the Examiner's; (2) Hyatt had the opportunity to present to the Board, if not the Examiner, his declaration indicating that one skilled in the art would recognize his claimed limitations as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

described in the specification for the '702 application; (3) Hyatt has no other explanation (aside from the "new grounds" argument) to address why he failed to offer his declaration during the proceedings before the Board; and (4) Hyatt's failure to explain why he didn't submit his declaration earlier is negligent, and the district court need not consider evidence negligently submitted after the end of administrative proceedings. _Killian_, 121 U.S.P.Q. at 509 ("Where a plaintiff in an action under Section 145... offers no explanation for his failure to submit to the Patent Office, during the prosecution of his application for patent, evidence purporting to show that he invented the claimed subject matter prior to the effective filing date of the application on which a patent said to anticipate was granted, such evidence is not properly admissible."). As a result, the court finds that Hyatt's declaration is not admissible.

Because Hyatt offers no other additional evidence aside from his declaration, the court reviews all of the Board's fact-findings using the more deferential "substantial evidence" standard. _Mazzari_, 323 F.3d at 1004-05. Under this standard, the court "asks whether a reasonable fact-finder could have arrived at the agency's decision."_In re Gartside_, 203 F.3d 1305, 1312 (Fed.Cir.2000). The Board's findings are not rendered unsupported by substantial evidence simply because it is possible to draw "two inconsistent conclusions." _Velander v. Garner_, 348 F.3d 1359, 1374 (Fed.Cir.2003) (quoting _Consolo v. Fed. Mar. Comm'n_, 383 U.S. 607, 620 (1966)). Therefore, "if the evidence of record will support several reasonable but contradictory conclusions, we will not find the Board's decision unsupported by substantial evidence because the Board chose one finding over another plausible alternative."_Id._ (citing _In re Jolley_, 308 F.3d 1317, 1320 (Fed.Cir.2002)).

**B. The Board's Affirmation of the Examiner's Written Description Rejections**

Before the court for review are ten written descriptions, relating to seventy-nine claims, that were rejected by both the Examiner and the Board. The rejections can be grouped into five categories. The court considers each category in turn.

**1. Vector Processor and Block Processor**

The Examiner rejected twenty-nine claims based on

their common "vector processor" and "block processor" subparagraphs.[FN12]R642-43, 647. The Board upheld the rejections of the vector and block processor limitations because Hyatt did not adequately describe the processors specified in his claims.[FN13]Specifically, the Board found that both limitations "require [ ] that the processor perform the function of 'generating two dimensional processed image information in response to ... video pixel information ... and in response to the two dimensional vector information generated by the vector generator.'" R1606. It determined that this language "implies that the 'generating' function operates on two kinds of input data: a pixel information from memory and vector information."_Id._ It found that "the specification describes graphics vectors being generated ... into image memory ..., _not_ being generated and used by a processor together with accessed pixel data read out from the block image memory, which would require bypassing the block memory."R1606-07. In other words, "the disclosed processor only controls the vector generator, it does not receive data from it or operate 'in response to' it."R1607. The Board therefore concluded that "[s]ince the vector information is stored into the block memory, we find no written description for a processor coupled to and performing the 'generating' function 'in response to' the vector information as well as 'in response to' image information from the image memory."_Id._ In essence, the Board found that while Hyatt did describe a processor, he did not describe "one that receives or responds to the two particular kinds of information-video pixel information and vector information-specified in his claim."Def.'s Reply at 16-17.

> FN12. An exemplary "vector processor" subparagraph for claims 1, 2, 5, 9, 10, 12, 20, 81, 85, 98, 110-114, 119, 120, 123, 127, 128, 130, 136, 153, 157, and 161 is set forth in claim 1:
>
> a two dimensional vector processor coupled to the accessing circuit and coupled to the vector generator, the two dimensional vector processor generating two dimensional vector processed image information in response to the accessed blocks of video pixel image information accessed by the accessing circuit and in response to the two dimensional vector

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information generated by the vector generator;

R1009-10. An exemplary "block processor" subparagraph for claims 17, 18, 133, and 134 is set forth in claim 17:

a two dimensional block processor coupled to the frame buffer accessing circuit and coupled to the vector generator, the two dimensional block processor generating two dimensional processed image information in response to the blocks of pixel image information accessed by the frame buffer accessing circuit and in response to the two dimensional vector information generated by the vector generator;

R1026-27.

FN13. The Board noted the similarity of the vector processor claims and the block processor claims and used the same reasoning in rejecting both limitations. R1607, 1613-14; *see also* R642.

*8 In his appeal to the Board, Hyatt presented one piece of evidence, Table 1, which identifies twenty-four words found in his claims and lists the number of times each one appears in his specification and the page number on which each is located. R832. It offers no explanation or response to the Examiner's rejections. Both the Examiner and the Board found Table 1 unhelpful and unpersuasive, for "merely pointing to isolated words scattered throughout the specification does not describe the invention claimed as a combination of elements, functions, and interconnections any more than a dictionary provides written description support for a book where words are used in combination to provide a certain meaning."R1595. With respect to the vector and block processor limitations, the Board stated that Hyatt "merely points to Table 1 ... for occurrences of words in the limitation and does not show where the specification describes the claimed structure or process."R1607. Notably, Hyatt did "not point to a written description of a processor performing a generating function responsive to the two specific types of information."*Id.*

It is well established that "the written description must include all of the limitations of the [claim], or the applicant must show that any absent text is necessarily comprehended in the description provided."*Hyatt v. Boone,* 146 F.3d 1348, 1354 (Fed .Cir.1998). Because a reasonable fact-finder could have arrived at the Board's conclusion that Hyatt did not "include all of the limitations" of this claim because he did not describe a processor that responds to both video pixel information and vector information, the court finds that the Board's decision to uphold the vector and block processor rejections was supported by substantial evidence.[FN14]

FN14. In his opposition, Hyatt relies on his declaration to support his contention that "the processor recited in the claims is supported by the disclosure."Pl.'s Opp'n at 19. However, the court has already determined that it will not consider Hyatt's declaration in deciding this motion on this or any other claim.

**2. Processor Generating Data Compressed Video**

The Board upheld the Examiner's rejection of fifty-two claims based on their common "data compression" subparagraphs because Hyatt again did not describe his claimed inventions in his specification.[FN15]The Board found that "[w]hile a processor is coupled to the accessing circuit comprising the block memory of figures 6E to 6N and the raster scan address generator of figures 6O and 6P, we find no disclosure of the processor 'generating data compressed video image information,' as claimed."R1608. It explained that "[t]he only compression mentioned in the specification is concerned with compression and decompression offline or online prior to loading into the image memory or in connection with an emulation program, not after it is stored in the block image memory."*Id.* In other words, Hyatt successfully describes data compression, but he fails to describe data compression *of video image information* because he only describes data compression that takes place *before* the video image information is formed; he never describes the data compression as taking place *after* the image data has been stored in the memory. R1608, 1609, 1611, 1617, 1620. Hyatt's appeal to the Board relied upon Table 1, which the Board again found unpersuasive.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 5569663 (D.D.C.)
**(Cite as: Slip Copy, 2005 WL 5569663)**

Because a reasonable fact-finder could conclude, as the Board did, that Hyatt failed to describe data compression of video image information, the Board's rejections of these claims are affirmed.

> FN15. An exemplary "data compression" subparagraph for claims 3, 4, 11, 121, 122, and 129 is set forth in claim 3:
>
> a processor coupled to the accessing circuit and generating data compressed video image information in response to accessed blocks of video pixel image information generated by the accessing circuit;
>
> R1012. An exemplary "data compression" subparagraph for claims 1, 85, 110-112, 119, and 157 is set forth in claim 1:
>
> a two dimensional spatial processor coupled to the buffer memory and generating data compressed video image information in response to the buffered blocks of video pixel information stored in said buffer memory and in response to the buffered two dimensional vector processed image information stored in said buffer memory;
>
> R1010. An exemplary "data compression" subparagraph for claims 6-9, 13, 14, 124-127, 131, and 132 is set forth in claim 6:
>
> A two dimensional frequency domain transform processor coupled to the accessing circuit and generating data compressed video image information in response to the accessed blocks of video frequency domain information accessed by the accessing circuit;
>
> R1016. Claim 112's "data compression" subparagraph is as follows:
>
> wherein the memory system is a video image data compression system;
>
> R1073. An exemplary "data compression" subparagraph for claims 2-14, 113, 114,

and 120-132 is set forth in claim 2:

> a two dimensional vector processor coupled to the accessing circuit and coupled to the vector generator, the two dimensional vector processor generating data compressed video image information in response to the accessed blocks of video pixel image information accessed by the accessing circuit and in response to the two dimensional vector information generated by the vector generator;
>
> R1011.

**3. Block Boundary Smoothing**

*9 The Board upheld the Examiner's rejections of twenty claims based on their common "block boundary smoothing" paragraph because it found "nothing in the specification that describes 'smoothing' or 'block boundary smoothing.' " " FN16 R1616. In his appeal to the Board, Hyatt directed them to Table 1, which lists the number of times and the page numbers on which the words "block," "boundary" and "smoothing" occur. R832. The Board considered this but again found it unhelpful, noting that the table "does not show written description for the limitation of 'block boundary smoothing'...." *Id.*It explained that while the word "smoothing" appears in Hyatt's specification in a particular program, it refers only to " 'SMOOTHING PRINTOUTS' without explanation." *Id.* Furthermore, the program which contains the word "smoothing" involves conventional computer memory, "it does not use a memory having blocks or block boundaries and so is not relevant to the issue of block boundary smoothing." *Id.* It was reasonable for the Board to determine that "block boundary smoothing" was not adequately described because the specification only mentions the word "smoothing" one time, and even in that lone occurrence, it is not used in the context of "block boundary smoothing." R234. The Board's rejections are affirmed.

> FN16. An exemplary "block boundary smoothing" paragraph for claims 34, 36, 42-45, 106-109, 141, 143, 145-148, and 169-172 is set forth in claim 34: "a block boundary smoothing processor generating block boundary smoothing information to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

smooth the pixel image information at boundaries between blocks of pixel image information;...." R1037.

## 4. Quantization

The Board upheld the Examiner's rejection of claim 116 for lack of written description support for the limitation that "the weighting processor is a quantization weighting processor...."[FN17] R1617, 1619. Based on Table 1, which Hyatt presented in response to the Examiner's determination that a quantization weighting processor was not described in the specification, R653, the Board found that quantization did exist somewhere in the system, but its mere existence "was not persuasive or written description support for the particular claim limitation at issue."R1619. The Board explained that "[t]he claim limitation is directed to quantization *after* the pixel image information is accessed (read) from block memory."*Id.* (emphasis added). Two of the programs in Hyatt's specification that involve quantization deal with loading a file to the image memory and prefiltering, both of which occur *before* the image information is accessed from the memory. *Id.* They therefore "do not appear relevant to the quantization written description at issue."*Id.* A third program, GRAPH.ASC (R216-18), "simply accesses (reads) pixel information out of memory ... and does not perform any frequency domain processing, does not control the weight memory accessing circuit, and does not perform any quantization weighting of weighted frequency domain information."*Id.* In short, "Hyatt claims a post-processor data manipulation when his description is limited to data manipulation that is pre-processor."Def.'s Reply at 31. The court once again finds that a reasonable fact-finder could have reached the same result as the Board did, and the rejection of this claim is sustained.

FN17. The quantization subparagraph of claim 116 states:

wherein the weighting processor is a quantization weighting processor generating the weighted frequency domain image information as quantized weighted frequency domain image information by weighting the frequency domain image information generated by the frequency domain processor in

response to the accessed weight information generated by the weight memory accessing circuit.

R1074-75.

## 5. Making a Product in Response to the Output Image Information

*10 Finally, the Board upheld the Examiner's rejection of claims 153-172 based on the following exemplary subparagraph, set forth in claim 153: "the act of making a product in response to the output image information."R1084. Both the Examiner and the Board found that there was no written description support for "making a product ." R1621; *see also* R655.

In his appeal to the Board, Hyatt attempted to argue that the term "products" necessarily includes "machines," "manufactures" and "signals," and because he discloses a "signal," his written description for "making a product" is sufficient. R837. The Board expressly addressed and rejected this argument because in the limitation, which states "making a product in response to ... image information," the " 'image information' is the signal and the 'product' must [therefore] be something else, which is not disclosed."R1621. It went on to explain that the Patent Act only covers three product classes: machines, manufactures, and compositions of matter. An electrical signal is a form of energy; it therefore does not fall within any of the three product classes and cannot be claimed. R1622; 35 U.S.C. § 101. A reasonable fact-finder could determine that a "signal" is not a "product" and conclude that Hyatt's "making a product" claim therefore lacks an adequate description. As such, the Board had substantial evidence to reject these claims.

## C. Enablement

Hyatt moves for partial summary judgment, arguing that the Board failed to meet its burden of proof in rejecting the claims for lack of enablement. The PTO concedes that its enablement rejections are tied entirely to its written description rejections. *See* Def.'s Mot. at 29. Having already rejected all of Hyatt's claims for lack of written description, the court need not decide Hyatt's motion for it is moot. *See Univ. of Rochester v. G.D. Searle & Co., 358*

Slip Copy                                                                                                    Page 12
Slip Copy, 2005 WL 5569663 (D.D.C.)
**(Cite as: Slip Copy, 2005 WL 5569663)**


F.3d 916, 929-30 (Fed.Cir.2004) (holding that upon affirming the district court's decision to reject the written descriptions, "we consider the enablement issue to be moot").

### CONCLUSION

For the foregoing reasons, the court grants the PTO's motion for summary judgment and denies Hyatt's motion for partial summary judgment. A separate order accompanies this memorandum opinion.

D.D.C.,2005.
Hyatt v. Dudas
Slip Copy, 2005 WL 5569663 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# ATTACHMENT C

LEXSEE 1991 U.S. DIST. LEXIS 1811



Cited
As of: Apr 17, 2008

**SANDVIK AKTIEBOLAG, and SANTRADE, LTD., Plaintiffs, v. JEFFREY M. SAMUELS, Defendant**

**Civil Action No. 89-3127-LFO**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*1991 U.S. Dist. LEXIS 1811; 20 U.S.P.Q.2D (BNA) 1879*

**February 7, 1991
February 7, 1991, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant patent commissioner moved for an order requiring plaintiffs to pay its expenses because plaintiffs appealed a decision of the Patent Board pursuant to *35 U.S.C.S. § 145.*

**OVERVIEW:** Plaintiff applicants for a patent renewal appealed the decision of the Patent Board of Appeals by suing defendant commissioner of patents. Defendant moved for an order requiring plaintiffs to pay its expenses. Specifically, defendant sought court reporter fees and the amount paid to an expert witness for assistance on questions of metallurgical technology. Although plaintiffs agreed to pay the court reporter fees, they contended that they did not have to reimburse the defendant for the money paid to the expert. The court found that because plaintiffs appealed to the district court under *35 U.S.C.S. § 145,* they had to pay all the reasonable expenses of the proceedings. Further, the court found that the expert witness fees were reasonable and justified. Accordingly, the court granted defendant's motion for expenses and ordered plaintiffs to pay the expenses.

**OUTCOME:** The court granted defendant's motion for expenses and ordered plaintiffs to pay defendant's expenses.

**JUDGES:** [*1] Louis F. Oberdorfer, United States District Judge.

**OPINION BY:** OBERDORFER

**OPINION**

*ORDER*

On November 20, 1990, defendant Jeffrey Samuels, the Acting Commissioner of Patents and Trademarks, moved for an order requiring plaintiffs to pay its expenses. Specifically, defendant seeks $ 9,451.75: $ 1,138.75 in court reporter fees, and $ 8,312.50 paid to Dr. Richard J. Arsenault of the University of Maryland for assistance on questions of metallurgical technology. Although the plaintiffs have agreed to pay the court reporter fees, they contend that they do not have to reimburse the defendant for the money paid to Dr. Arsenault.

Applicants for patents, or in this case applicants for a renewal of a patent, may appeal the decision of the Patent Board of Appeals in one of two ways. They may appeal on the record to the United States Court of Appeals for the Federal Circuit, *see 35 U.S.C. § 144 (1988),* or they may appeal *de novo* to the United States District Court for the District of Columbia, *see id. § 145.* If an applicant chooses the latter avenue of appeal, "all the expenses of the proceedings shall be paid by the applicant." *Id.* These expenses must be paid win, lose, or draw. *See, e.g., Cook* [*2] *v. Watson, 208 F.2d 529, 530 (D.C. Cir. 1953).* An applicant is, however, only responsible for those expenses that are reasonable. *See Watson v. Allen, 274 F.2d 87, 88 (D.C. Cir. 1959).* The expert witness fees paid to Dr. Arsenault satisfy this standard.

Case 1:07-cv-01504-ESH     Document 20-5     Filed 04/17/2008     Page 3 of 3

Page 2

1991 U.S. Dist. LEXIS 1811, *; 20 U.S.P.Q.2D (BNA) 1879

In the first place, it was more than reasonable to retain an expert in this litigation. The Commissioner has used experts in 229 previous civil actions. *See Gould v. Mossinghoff, 229 U.S.P.Q. 1, 2 (D.D.C. 1985), aff'd in part and vacated in part, 822 F.2d 1074 (Fed. Cir. 1987).* In this case, there is an especially strong need for expert testimony because the patent at issue involves a highly technical issues: the novelty of a particular process for producing zirconium alloy that the applicants claim produces greater "creep strength."

Furthermore, the Commissioner hired Dr. Arsenault in a reasonable manner. The Commissioner first suggested to the plaintiffs that they hire a joint expert. When plaintiffs refused, the Commissioner then consulted with various government agencies. When he was unable to find a suitable expert there, the Commissioner investigated two outside experts, one from the Massachusetts Institute of Technology [*3] and the other, Dr. Arsenault. Because Dr. Arsenault asked for smaller fees and promised lower expenses due to his proximity, the Commissioner hired him. The plaintiffs have suggested that the Commissioner could have used a patent examiner for the same purposes. The Commissioner, however, has explained that while patent examiners are experts in reviewing patent applications in particular fields, they do not have actual experience in the technology. As a consequence, patent examiners would presumably be at a disadvantage when faced with the testimony of true experts. Furthermore, the Commissioner argues, because patent examiners are quasi-judicial officers, there is no assurance that they will make effective witnesses. These justifications for retaining an outside expert are eminently reasonable.

Finally, Dr. Arsenault's charges were reasonable. First of all, his rates were reasonable: He charged $ 125/hour with a maximum daily fee of $ 750. Second, his hours were clearly documented and well-justified: He spent 30.5 hours reviewing the extensive records of the proceedings in the patent office. Although plaintiffs contend that he could have limited his reading to selected documents in [*4] the record, they assume that Government counsel were competent to indicate which parts of the record were material. To the contrary, it was in order to determine what technological issues were material that the Commissioner hired Dr. Arsenault in the first place. Arsenault also spent 27 hours preparing for or attending depositions. Although not all the deponents were experts, they were fact witnesses concerning the metallurgical process at issue. It was therefore reasonable for government counsel to have an expert involved. Finally, Arsenault spent another 10 hours consulting with counsel. This time was clearly reasonable.

Accordingly, it is this 7th day of February, 1991, hereby

ORDERED: that defendant's Motion for Expenses should be, and is hereby, granted; and it is further

ORDERED: that plaintiffs shall pay defendant's expenses in the amount of $ 9,451.75.

# ATTACHMENT D

 UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

**MEMORANDUM**

**DATE:**     May 3, 2007

**TO:**     Technology Center Directors

**FROM:**     Margaret A. Focarino
Deputy Commissioner
for Patent Operations

**SUBJECT:**     Supreme Court decision on *KSR Int'l. Co., v. Teleflex, Inc.*

The Supreme Court has issued its opinion in *KSR*, regarding the issue of obviousness under 35 U.S.C. § 103(a) when the claim recites a combination of elements of the prior art. *KSR Int'l Co. v. Teleflex, Inc.*, No 04-1350 (U.S. Apr. 30, 2007). A copy of the decision is available at http://www.supremecourtus.gov/opinions/06pdf/04-1350.pdf. The Office is studying the opinion and will issue guidance to the patent examining corps in view of the *KSR* decision in the near future. Until the guidance is issued, the following points should be noted:

(1) The Court reaffirmed the *Graham* factors in the determination of obviousness under 35 U.S.C. § 103(a). The four factual inquiries under *Graham* are:
   (a) determining the scope and contents of the prior art;
   (b) ascertaining the differences between the prior art and the claims in issue;
   (c) resolving the level of ordinary skill in the pertinent art; and
   (d) evaluating evidence of secondary consideration.

*Graham v. John Deere*, 383 U.S. 1, 17-18, 148 USPQ 459, 467 (1966).

(2) The Court did not totally reject the use of "teaching, suggestion, or motivation" as a factor in the obviousness analysis. Rather, the Court recognized that a showing of "teaching, suggestion, or motivation" to combine the prior art to meet the claimed subject matter could provide a helpful insight in determining whether the claimed subject matter is obvious under 35 U.S.C. § 103(a).

(3) The Court rejected a rigid application of the "teaching, suggestion, or motivation" (TSM) test, which required a showing of some teaching, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the prior art elements in the manner claimed in the application or patent before holding the claimed subject matter to be obvious.

(4) The Court noted that the analysis supporting a rejection under 35 U.S.C. § 103(a) should be made explicit, and that it was "important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the [prior art] elements" in the manner claimed. The Court specifically stated:

> Often, it will be necessary . . . to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an **apparent reason** to combine the known elements in the fashion claimed by the patent at issue.  To facilitate review, this analysis **should be made explicit**.

*KSR*, slip op. at 14 (emphasis added).

**Therefore, in formulating a rejection under 35 U.S.C. § 103(a) based upon a combination of prior art elements, it remains necessary to identify the reason why a person of ordinary skill in the art would have combined the prior art elements in the manner claimed.**

2

# ATTACHMENT E

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

## BEFORE THE BOARD OF PATENT APPEALS
## AND INTERFERENCES

Application Number: 08/879,517
Filing Date: June 20, 1997
Appellant(s): USHIWATA ET AL.

**MAILED**

JUN 1 7 2005

**Group** 3700

Paul Devinsky
For Appellant

### EXAMINER'S ANSWER

This is in response to the appeal brief filed 11 April 05.

**(1)    *Real Party in Interest***

A statement identifying the real party in interest is contained in the brief.

**(2)    *Related Appeals and Interferences***

A statement identifying the related appeals and interferences which will directly

affect or be directly affected by or have a bearing on the decision in the pending appeal

is contained in the brief.

Application/Control Number: 08/879,517                                    Page 2

Art Unit: 3724

*(3)*    ***Status of Claims***

The statement of the status of the claims contained in the brief is correct.

*(4)*    ***Status of Amendments After Final***

The appellant's statement of the status of amendments after final rejection

contained in the brief is correct.

*(5)*    ***Summary of the Claimed Subject Matter***

The summary of invention contained in the brief is correct.

*(6)*    ***Grounds of Rejection to be Reviewed by Appeal***

The appellant's statement of the issues in the brief is correct.

*(7)*    ***Claims Appealed***

The copy of the appealed claims contained in the Appendix to the brief is correct.

*(8)*    ***Prior Art of Record***

| 1,417,669 | Langworthy | May 1922 |
|---|---|---|
| 3,013,592 | Ambrosio et al. | Dec 1961 |
| 4,531,441 | Bergler | Jul 1985 |
| 4,574,670 | Johnson | Mar 1986 |
| 5,357,834 | Ito et al. | Oct 1994 |
| DE3,640,784 | Haffner* | Mar 1988 |

Appellant's admitted prior art, figures 6 and 7, lines 11-33 of column 1.

* Translation from German included. The pertinent embodiment is that of figures

2 and 3. The entire sawing structure (5,15,14,9,13b) pivots about the axis K as

seen in figure 2. The motor axis is parallel to the blade axis and spaced radially

beyond the blade. As seen in figure 3, the entire sawing structure can pivot more

than 45 degrees to either side to produce a variety of miter cuts.


### (9)    *Grounds of Rejection*

The following ground(s) of rejection are applicable to the appealed claims:


### Issue I.- Claim rejections - Oath

In accordance with 37 CFR 1.175(b)(1), a supplemental reissue oath/declaration

under 37 CFR 1.175(b)(1) must be received before this reissue application can be

allowed.

Claims 1-3,26,27,37,48-56 and 58-62 are rejected as being based upon a defective

declaration under 35 U.S.C. 251. See 37 CFR 1.175. Receipt of an appropriate

supplemental oath/declaration under 37 CFR 1.175(b)(1) will overcome this rejection

under 35 U.S.C. 251. An example of acceptable language to be used in the

supplemental oath/declaration is as follows:

> "Every error in the patent which was corrected in the present reissue application, and is not covered by
> a prior oath/declaration submitted in this application, arose without any deceptive intention on the part
> of the Appellant."


### Issue II - Claim rejections – 35 USC 103

Claims 1-3,26,27,37,48-56,58-62 are rejected under 35 U.S.C. 103(a).

Appellant's admitted prior art is shown in figures 6 and 7 and described on lines

11-33 of column 1 of Appellant's patent. The admitted prior art shows a miter saw with

most of the recited limitations including a turntable (2), a clamp (5), a transmission (fig

7), a saw blade (10), a motor shaft (12), a first shaft (4), and second shaft (7). The

admitted prior art blade tilts out of the vertical plane at least by 45 degrees to the left

side, as discussed on line 23 of column 1, but on the right side, it can tilt only 20-30

degrees, as seen in figure 7 and discussed on line 26 of column 1.

Appellant further admits, in column 1, that the *desire* to pivot 45° either way is an

old and well known desire that has been filled by different machines.

Given that pivoting 45° either way is known to be desirable, one of ordinary skill

would look to similar sawing machines to see how this might be accomplished.

The art area of highly angleable saws that move toward the workpiece to make a

cut contains numerous examples of motors that are placed radially beyond the blade

and parallel to the blade shaft. An example is Johnson '670, the ultimate sawing

machine for angling adjustability. Johnson is very much concerned with giving the

maximum amount of pivotability to all of his parts, as best evidenced in figure 3.

Johnson teaches that placing a small motor directly over, and radially beyond the saw

blade enables the blade to tilt in either direction. As seen by the almost 180 degree arc

of rack 49, Johnson can tilt significantly more than 45 degrees in either direction.

A second example of this is the German patent to Haffner (mentioned now for the

first time in support of the Examiner's taking of Official Notice). In the embodiment of

figures 2 and 3, Haffner shows an oscillating miter saw that has the motor shaft radially

beyond, and parallel to, the blade shaft. The skinny transmission (figure 6) enables the

blade to pivot 45 degrees in either direction, as seen in figure 3.

Application/Control Number: 08/879,517                                     Page 5
Art Unit: 3724

There are many other examples of prior art that employ motors that are radially
beyond the blade and parallel to the blade shaft: See Langworthy '669 and Ambrosio et
al.'592. Both of these patents place the motor in this location to enable more room for
the saw to operate resulting in greater angleability.

It would have been obvious to one of ordinary skill in the art to have modified
Appellant's admitted prior art by placing the motor shaft radially beyond the saw blade
and parallel to the saw blade shaft, as is well known and suggested by Johnson,
Haffner, Langworthy and Ambrosio, in order to fulfill the old and well known desire to
pivot 45°, or more, to both the left and the right. Any change in the size or shape of the
motor or transmission necessary to meet the suggested goal of pivoting 45 degrees
either way would be well within the capabilities of one of ordinary skill.

Appellant's admitted prior art is a belt, but Appellant will readily admit that
replacing a belt transmission with a gear transmission is well known and would have
been obvious to one of ordinary skill, since they are well known equivalents. For
example, see Langworthy.

**Issue III - Claim rejections – 35 USC 103**

Claims 1-3,26,27,37,48-56,58-62 are rejected under 35 U.S.C. 103(a) as being
unpatentable.

Bergler shows a miter saw with most of the recited limitations including a clamp
(33), a transmission (15), a saw blade (11) and a motor shaft (16) mounted generally

above the saw blade.  Bergler's blade tilts out of the vertical plane at least by 45

degrees to one side, as best seen in figure 2, by pivoting about a first shaft (33) that is

*substantially* at the level of said top surface of said base.  Bergler also shows a clamp

(rotation of wings on shaft 33) for clamping the saw blade at an angle of up to 45

degrees.  Bergler's circular saw assembly oscillates into the workpiece about a second

shaft (17).

On lines 45-57 of column 3, Bergler states that it would be desirable to make the

blade pivot the other way as well, if provision could be made for parts not running into

each other.  Given such a suggestion, one of ordinary skill would look to similar sawing

machines to see how this might be accomplished.   The art area of highly angleable

saws that move toward the workpiece to make a cut contains numerous examples of

motors that are placed radially beyond the blade and parallel to the blade shaft.   An

example is Johnson '670, the ultimate sawing machine for angling adjustability.

Johnson is very much concerned with giving the maximum amount of pivotability to all

of his parts, as best evidenced in figure 3.  Johnson teaches that placing a small motor

directly over, and radially beyond the saw blade enables the blade to tilt in either

direction.  As seen by the almost 180 degree arc of rack 49, Johnson can tilt

significantly more than 45 degrees in either direction.

A second example of this is the German patent to Haffner (mentioned now for the

first time I support of the Examiner's taking of Official Notice).  Haffner clearly shows in

figure 2 how placing the motor shaft radially beyond, and parallel to, the blade shaft

enables the blade to pivot 45 degrees in either direction. Haffner in particular teaches

the trick of using a skinny transmission to avoid contact with the work support area.

There are many other examples of prior art that employ the motors that are

radially beyond the blade and parallel to the blade shaft: See Langworthy '669,

Ambrosio et al.'592. Both of these patents place the motor in this location to enable

more room for the saw to operate resulting in greater angleability.

It would have been obvious to one of ordinary skill in the art to have modified

Bergler by reconfiguring his motor and transmission size and shape, as is well known

and suggested by Johnson, Haffner, Langworthy and Ambrosio, in order to fulfill

Bergler's desire for multi-directional pivoting. Of course, Bergler's slot in guide 19 would

logically be extended to permit the additional pivoting, since Bergler himself suggested

the additional pivoting. Other obvious modifications could be made to Bergler to allow

better 45° tilting, such as spacing the two pivots (6,6) further apart so that the tilted saw

did not hit the side frame (2) with the whole saw table is flipped over.

Bergler's transmission is a belt, but Appellant will readily admit that replacing a

belt transmission with a gear transmission is well known and would have been obvious

to one of ordinary skill, since they are well known equivalents, as seen in Langworthy.

If it is interpreted that Bergler's first shaft (33) is not "*substantially at a level of*

*said top surface of said base*", then the following rejection applies. Bergler's first shaft

(33) guides the pivot bearing (18) in an arcuate path to tilt the saw blade. However,

Bergler's first shaft (33) is not at the central axis of said arcuate path, but instead is

slightly above the base and partakes in the arcuate movement. However, much more

prevalent in the art is the type of first shaft shown by Ito (17), which is at the exact same

level of the top surface of said base.  It would have been obvious to one of ordinary skill

in the art to have modified Bergler by replacing his first shaft pivot system with Ito's first

shaft pivot system, since they are art recognized equivalents known for the same

purpose as per MPEP 2144.06, and in order to simplify construction (two aligned holes,

as opposed to a hole and an arcuate slot).


**Issue IV - Claim rejections – 35 USC 103**

Claims 1-3,26,27,37,48-56,58-62 are rejected under 35 U.S.C. 103(a) as being

unpatentable.

Ito '834 shows a miter saw with most of the recited limitations including a first

shaft (17), a clamp (knob at end of first shaft), a second shaft (30), a transmission (39),

a saw blade (36) and a motor shaft (42) mounted generally above the saw blade.  Ito's

blade tilts 45 degrees to both sides, as best seen in figure 2.

In column 1, Ito discusses the desirability of pivoting both ways without having

the sawing apparatus running into other parts of the machine.  Ito solves this problem

one way (by angling the motor shaft), but given such a suggestion, one of ordinary skill

would look to similar sawing machines to see how this might be accomplished.  The art

area of highly angleable saws that move toward the workpiece to make a cut contains

numerous examples of motors that are placed radially beyond the blade and parallel to

the blade shaft.  An example is Johnson '670 , the ultimate sawing machine for

adjustability. Johnson is very much concerned with giving the maximum amount of

Application/Control Number: 08/879,517                                    Page 9
Art Unit: 3724

pivotability to all of his parts, as best evidenced in figure 3. Johnson teaches that

placing a small motor directly over, and radially beyond the saw blade enables the blade

to tilt more than 45 degrees in either direction.

A second example of this is the German patent to Haffner (mentioned now for the

first time I support of the Examiner's taking of Official Notice). Haffner clearly shows in

figure 2 how placing the motor shaft radially beyond, and parallel to, the blade shaft

enables the blade to pivot 45 degrees in either direction. Haffner also teaches the key

trick of employing a skinny transmission (figures, 3,6).

There are many other examples of prior art that employ the motors that are

radially beyond the blade and parallel to the blade shaft: See Langworthy '669 and

Ambrosio et al.'592. Both of these patents place the motor in this location to enable

more room for the saw to operate resulting in greater angleability.

It would have been obvious to one of ordinary skill in the art to have modified Ito

by using a small motor directly over, and radially beyond the saw blade, as is well

known and suggested by Johnson, Haffner, Langworthy and Ambrosio, in order to fulfill

Ito's desire for multi-directional pivoting. It is deemed that Ito's motor shaft angling and

Johnson's motor shaft positioning are equivalents known for the same purpose, and

therefore it would have been obvious to replace one with another as per MPEP

2144.06.

In regards to claims 2 and 3, the motor shaft could be belted or geared to the

saw blade shaft, as taught by Langworthy's figures 2 and 3. It would have been obvious

to one of ordinary skill in the art to have either belted or geared the motor shaft and saw

Application/Control Number: 08/879,517                                      Page 10
Art Unit: 3724

blade shaft, as taught by Langworthy, since these are art recognized equivalents known

for the same purpose.


### Non-Issue - Claim rejections – 35 USC 103

Claim 37 is rejected under 35 U.S.C. 103(a) as being unpatentable any of the

above rejections, and further in view of Brickner et al.'902.

If it is interpreted that the teachings of the above rejections are not sufficient to

modify the base references to tilt both left and right to an angle *greater* than 45°, then

Examiner introduces Brickner '902, who teaches that mitering angles should extend to

47° (lines 31 and 32, column 2). This is done to give the operator an opportunity to

compensate for any slight warpage of the workpiece or machine.  For example, if one

was making a mitered-corner picture frame, and the wood was slightly warped, one

might be only able to cut a 44° angle with his 45° miter saw, thus yielding a picture

frame that had gaps at its joints.

It would have been obvious to one of ordinary skill in the art to have further

modified any of the above rejections by making it pivot 47° either way, since a 47° miter

saw could compensate for warpage better than a 45° miter saw could.


### (10)   *Response to Argument*

Appellant has stated that all claims stand or fall with claim 1, so the Examiner

has responded to these arguments as if claim 1 were the only claim.  If, for some

Application/Control Number: 08/879,517                                    Page 11
Art Unit: 3724

reason, the board chooses to consider arguments for other claims, the case should

be remanded to the Examiner so that he can address those claims in his response.

### Non-issue – Finality

Appellant's argument that the finality of the rejection is improper is noted. Since

Appellant has elected to proceed instead of challenging this point, the argument is

moot.

### Issue I - Claim rejections – Oath

Appellant has not challenged this rejection, and so it is assumed that it will stand.

### Issue II - Claim rejections – 35 USC 103 employing admitted prior art

Appellant states that Examiner is relying on the Japanese Application 49901/88.

This is incorrect. As pointed out previously, Examiner is not relying of the Japanese

'901 Application, but is instead relying on the admitted prior art from lines 11-33 of

column 1 of Appellant's patent, accompanied by Appellant's acknowledgement in

column 1 that it is an old and well known desire to have a miter saw pivot 45 degrees in

both directions.

Appellant argues that it was improper for the Examiner to take Official Notice. This

is interpreted to be a challenge, and Examiner has accordingly provided references to

back up his taking of Official Notice. Johnson, Ambrosio and Langworthy were already

exampled in the rejection. The German patent to Haffner is now (for the 1st time) also

exampled in the rejection in further support of the taking of Official Notice. The reason

the Examiner took Official Notice is because so many references showed this feature.

However, since Appellant has challenged this taking of Official Notice, Examiner has

removed it and the Board need only considered the four references (Johnson,

Ambrosio, Langworthy and Haffner) to determine obviousness. Since Langworthy and

Ambrosio were brought in mainly for the dependent claims (not independently contested

here), the board may choose to ignore Langworthy and Ambrosio.

Appellant argues that none of the secondary references are the same type of miter

saw as is the base reference (Appellant's admitted prior art).  The *in re Oetiker* test for

analogous arts *states*

"In order to rely on a reference as a basis for rejection of an applicant's invention,

the reference must either be in the field of applicant's endeavor or, if not, then be

reasonably pertinent to the particular problem with which the inventor was concerned."

In this case, all of the art is both from Appellant's field of endeavor (advancing

circular saw miter cutting) and also are directed to the problem with which the inventor

was concerned (pivoting the saw 45° to make miter cuts).

Appellant argues that Johnson's miter saw is not from the same field as the admitted

prior art, because the admitted prior art is compact and fits on a desk top. Nonetheless,

Johnson, Haffner and the admitted prior art are similar enough in style and intent that

they logically would have commanded themselves to an inventor's attention in

considering his problem.

Truthfully, there are some differences. Johnson's cutting motion is linear, whereas

the admitted prior art's cutting motion is oscillating. Haffner's saw is an inverted

compound miter saw. However, the purpose and effect of the devices are quite similar

to Appellant's, namely to move a circular saw blade into a workpiece to make a variety

of miter cuts. One of ordinary skill in the art would quickly recognize that the Admitted

prior art, Johnson and Haffner are all from the same field of endeavor and all are

designed explicitly for making a large variety of miter cuts using an advancing circular

saw blade. So while there are some differences, they are similar enough that the

teachings of one are obvious to apply to another.

Appellant argues that there is no motivation to combine. However, Appellant

himself has stated that the motivation to angle up to 45° both ways is an old and well

known desire. Furthermore, Ito expresses this motivation quite clearly. Given this

desire, one of ordinary skill would assay the known motor-blade relationships and try

the motor and transmission configuration shown by at least Johnson and Haffner, and

easily achieve the claimed invention.

Appellant argues that there is no motivation to make the motor or transmission

smaller. Appellant also points out that none of the prior art mention changing the motor

or transmission size. Examiner notes that this step may not even be necessary, since

the motors and transmissions of Johnson and Haffner appear to need no resizing to

pivot 45 degrees either way. Appellant is reminded that that references need not be

bodily incorporated into one another, but instead should be analyzed for what they

suggest to one another. In this case, Johnson, Haffner, Langworthy or Ambrosio

suggest putting a motor in the claimed position, but it is the aforementioned old and well known desire to angle to 45° both ways that would motivate one of ordinary skill to conduct the routine engineering of properly sizing the various parts to achieve that which is desired.

Appellant argues that the "desire" to pivot 45° both ways in a miter saw comes from Appellant's own specification and therefore is an improper motivation to combine the prior art. On the contrary, this desire was known for years (as admitted in column 1) and also shown by Ito '834.

Appellant argues that even if the admitted prior art is modified as suggested by the Examiner, it still would not pivot 45 degrees to either side without contacting the workpiece support surface. Examiner responds by noting that Haffner, in particular, shows pivoting 45 degrees to either side, and Haffner has clearly made a skinny transmission and positioned his motor so that they do not contact anything during said pivoting.

Appellant argues that Johnson cannot pivot 45 degrees to both sides, at least not in situations where he is cutting on the side of the workpiece that is opposite the blade transmission, as seen in Appellant's page 23. It is noted that Appellant's drawing may be somewhat exaggerated and Examiner also notes that the test, as claimed, is NOT whether the transmission would hit the workpiece, but whether the transmission would hit the workpiece support surface. Even Appellant's own transmission would hit the top surface of an overly thick workpiece. Examiner also notes that Johnson's track 49, which spans almost 180 degrees, clearly shows that the saw blade is capable of

Application/Control Number: 08/879,517                                    Page 15
Art Unit: 3724

pivoting 45 degrees (and then some) to either side. Examiner Acknowledges that this

ability is contingent upon certain workpiece and workpiece support configurations, but

*the same goes for Appellant's device.* Examiner further points out that Haffner clearly

shows pivoting 45 degrees either way while using a motor shaft that is parallel to the

blade shaft and radially beyond the blade.

Appellant argues against the analogousness of the Ambrosio and Langworthy

patents. However, these patents were only mentioned to cover some features of the

dependent claims. Since Appellant has stated that all claims stand or fall with claim 1,

there is not much point arguing about Langworthy or Ambrosio.


**Issue II - Claim rejections – 35 USC 103 employing Bergler**

Bergler is quite similar to Appellant's admitted prior art, except the motor shaft is

radially beyond the blade. The key paragraph in Bergler (line 45-57, column 3) is as

follows;

"*As FIG. 2 indicates, saw assembly 9 can be pivoted to one side through an angle $\beta$*

*of 45° motor 16 and 16a assuming a position 16a'. In the embodiment, pivoting in the*

*other direction is prevented by the fact that pivot bearing 18 is equipped with a*

*corresponding stop extension 34. Of course, it would also be possible in the opposite*

*direction if provision were made for driving housing 15 and other parts of saw assembly*

*9 not to pivot so far outward that they would prevent rotation of base plate 1, round table*

*10 and saw assembly 9 through 180° between miter and table saw positions about axis*

*6' of bearing pins 6.*"

Bergler is clearly referring to pivoting the saw about a horizontal axis to make miter cuts, as seen in figure 2. The terms "other direction" and "opposite direction", being part of inter-linked sentences, both mean the same thing and are referring to angling in the negative $\beta$ direction, but only if the suggested structural changes are made.

When Bergler says *"it would also be possible in the opposite direction"*, the term "*it*" is referring back to "pivoting 45°" from earlier in the paragraph. This leaves one of ordinary skill with the task of modifying Bergler's "*driving housing 15 and other parts of saw assembly*" to achieve the stated goal of pivoting 45° in the opposite direction.

This suggested modification is within the skill of one of ordinary skill in the art and could be accomplished in three steps as follows;

1) Bergler mentions that the stop 34 would stop pivoting in the opposite direction (line 48-51, column 3). As seen in figure 2, it would be simple to reposition this stop 45° further to the left, since Bergler himself suggests pivoting 45° further to the left.

2) Bergler suggests modifying the drive housing (line 52, column 3) so that it doesn't hit anything. This could be done by making it smaller, as seen in Johnson, and/or making the transmission skinnier and the motor further away, as seen in Haffner.

3) Bergler suggests modifying "*other parts of the saw assembly*" so that Bergler would retain his ability to flip upside down and convert into a table saw. This suggested modification has numerous possible solutions, such as making the whole table wider by spacing the two pivots (6,6) further apart so that the tilted saw did not hit the side frame (2) when the whole saw table is flipped over.

Application/Control Number: 08/879,517                          Page 17
Art Unit: 3724

Please see the Examiner's responses to the previous rejection for addressing issues

such as the analogousness of the secondary references.

Even if it is interpreted that Bergler does not teach pivoting a full 45° to either side,

Examiner notes that such is a well known desire, as shown by Ito, and one of ordinary

skill would thusly have been motivated to make Bergler pivot 45° to either side.

The only other unique issue in the Bergler rejection is whether the horizontal pivot

shaft (33) is at the claimed position vertically. However, this argument (pages 32-35 of

Appellant's brief) is not germane to claim 1 since argued claim 1 does not claim this

position vertically.


**Issue III - Claim rejections – 35 USC 103 employing Ito**

Appellant argues that there is no suggestion to modify Ito's angled motor shaft

with a parallel motor shaft of the prior art (most notably Johnson and Haffner).

In this case, it is obvious to substitute one motor configuration for another, since they

are both art recognized equivalents known for the same purpose. For example, Both

Ito's and Haffner's motor and transmission configurations were clearly designed to

enable miter cuts of up to 45 degrees and larger in either direction. This is a similar

situation to the last example set forth in MPEP 2144.06, quoted herebelow;

*The mere fact that phthalocyanine and selenium function as equivalent*

*photoconductors in the claimed environment was not sufficient to establish that one*

*would have been obvious over the other. However, there was evidence that both*

*phthalocyanine and selenium were known photoconductors in the art of*

Application/Control Number: 08/879,517                                    Page 18
Art Unit: 3724

electrophotography. *"This, in our view, presents strong evidence of obviousness in substituting one for the other in an electrophotographic environment as a photoconductor." 209 USPQ at 759.).*

To paraphrase the above, in this case, Ito, Johnson and Haffner are evidence that both motor configurations were known in the art of mitering circular saws. This, in the Examiner's view, presents strong evidence of obviousness in substituting one for the other in any mitering circular saw.

Please see the Examiner's responses to the previous rejection for addressing issues such as the analogousness of the secondary references.

For the above reasons, it is believed that the rejections should be sustained.

Respectfully submitted,

kp
16 June 05

**KENNETH E. PETERSON**
**PRIMARY EXAMINER**

Conferees

Allan N. Shoap (SPE 3724)

Derris Banks (SPE 3725)

SUGHRUE MION ZINN MACPEAK & SEAS
2100 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20037-3202