# EXHIBIT B

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2   - - - - - - - - - - - - - - - - -x
    HITACHI KOKI CO., LTD.,           :
3                                     :
              Plaintiff,              :
4                                     :
    v.                                : Civil Action No.
5                                     : 07-1504 (ESH)
    JON W. DUDAS, Director, United    :
6   States Patent & Trademark Office,:
                                      :
7             Defendant.              :
    - - - - - - - - - - - - - - - - -x
8

9          Videotaped Deposition of PAUL HATCH

10                      VOLUME I

11                   Alexandria, VA

12              Monday, November 24, 2008

13                      9:35 a.m.

14

15              *       *       *       *

16

17

18

19

20

21  Reported by:  Okeemah S. Henderson, LSR

22
```

Page 70

1  protruding well behind and well below a desktop
2  surface and that it would be very difficult if not
3  impossible to redesign this mechanism for
4  practical desktop use." Do you see that?
5      A.   Yes.
6      Q.   And what would be involved to redesign
7  Johnson for what you say is practical desktop use?
8      A.   I don't believe I would redesign
9  Johnson if I were designing something for
10 practical desktop use.
11     Q.   Why not?
12     A.   It wouldn't be a good place to start.
13     Q.   Have you thought about how you would
14 do it?
15     A.   In regards to writing the declaration,
16 I did ask myself that question and my conclusion
17 was if I were asked to design a desktop miter saw
18 using this patent, I would really be asking to
19 work outside of what is given here. This would
20 not provide me what I need for designing that.
21     Q.   Were you asked to take Johnson and
22 redesign it for desktop use?

Page 71

1      A.   I was not.
2      Q.   What was your understanding of the
3  purpose of your declaration?
4      A.   Can you clarify the question maybe
5  more specific?
6      Q.   What was the point of your
7  declaration?
8      A.   The point? There are a number of
9  points here.
10     Q.   Okay.
11     A.   But I don't know are you asking for a
12 summary?
13     Q.   Well, as to Johnson, what did you see
14 your role in this lawsuit to be as to the Johnson
15 reference?
16     A.   My role was to look at the Johnson
17 patent and understand whether this would be
18 applicable or not.
19     Q.   Applicable in what ways? Were there
20 particular features you were looking for?
21          MR. CONNELLY: Objection. Compound.
22     A.   I don't think I was specifically asked

Page 72

1  for certain things but in regarding this, I was
2  looking at it as one skilled in the art would to
3  understand the teachings from the patent.
4          BY MS. LYNCH:
5      Q.   And were you asked to opine on
6  specific portions of Johnson?
7      A.   I'm sorry. Repeat?
8      Q.   Were you asked to give an opinion as
9  to certain portions of Johnson?
10     A.   Not specifically certain portions of
11 Johnson. No. I was not asked to. I was not
12 pointed to any particular part of Johnson, if
13 that's what you're asking.
14     Q.   You say paragraph 6, "Johnson
15 describes ways to create miter cuts but does not
16 refer to bevel cuts." Do you see that?
17     A.   I'm sorry. Paragraph 6?
18     Q.   Paragraph 6 on page 11.
19     A.   I see that. Yes.
20     Q.   And again, when you say does not refer
21 to bevel cuts, you mean the word bevel is not in
22 Johnson? Is that what you mean there?

Page 73

1          MR. CONNELLY: Objection. Compound.
2      A.   I believe he does not describe the
3  bevel cut action directly. He talks at length
4  about miter cuts.
5          BY MS. LYNCH:
6      Q.   Didn't you say on page 10 that Axis B
7  refers directly to beveling?
8      A.   Which part are you referring to?
9      Q.   Your little paragraph 1 at the top of
10 page 10?
11     A.   That the Johnson patent does not refer
12 to bevel cuts?
13     Q.   Right. And then you say --
14     A.   It is important to note that only
15 Axis B refers directly to beveling.
16     Q.   Right. Do you see that?
17     A.   I just read it.
18     Q.   Okay. So Johnson does refer directly
19 to beveling; is that correct?
20     A.   In Figure 2 there is a motion which is
21 B which would refer to the motion such as beveling
22 but it is not described at length by the text or

Page 74

1  certainly not by -- it's certainly not part of his
2  description of how to use the apparatus.
3      Q.   Can we go to Johnson column 5?
4      A.   (The witness complies.)
5      Q.   Lines 14 through 15, 13 through 15.
6  Do you see that?
7      A.   I see it. Yes.
8      Q.   And it says, "This permits smaller or
9  larger angles in addition to the plus or minus 45
10 degree capability of cutting member positioning
11 mechanism 17."
12     A.   Yes, I see that.
13     Q.   And what is your understanding of what
14 that's referring to?
15     A.   To -- I should read that full sentence
16 before. (The witness complies.) It's referring to
17 a miter angle.
18     Q.   And what's your basis for saying that?
19     A.   Because -- I shall read it. "The
20 tenth degree of relative motion in addition to the
21 nine discussed above is angle Z which affords the
22 rotation of the cut piece handling mechanism about

Page 75

1  an axis perpendicular to angles A and B.
2      Angle Z having a central rotation, extends
3  vertically through the point of count 21. Angle Z
4  adds or subtracts two and from the angle C and
5  provides increased angular adjustments of the
6  cutting member 19 on the cut piece.
7      The Z and C are all referring to vertical
8  rotational angles which is a miter direction, not
9  bevel."
10     Q.   Does cutting member positioning
11 mechanism 17 control the B angle?
12     A.   Can you repeat that. Does --
13     Q.   Does 17 control the B angle?
14     A.   I don't think you can say that. How
15 would 17 control -- how do you mean by control the
16 B angle?
17     Q.   Explain to me why -- explain to me how
18 17 works?
19     A.   That's a very general question. In
20 what regard? How it may be moved?
21     Q.   How it moves?
22     A.   According to Figure 2 it moves using

Page 76

1  Axis Z, Y, B and C.
2      Q.   So all of those?
3      A.   All or any of those. Yes.
4      Q.   Is the word bevel or was the word
5  bevel in claim one?
6      A.   In claim one of Johnson?
7      Q.   No.
8      A.   Is that what you're asking?
9      Q.   No. Of Ushiwata.
10     A.   I would have to read through it. I
11 don't recall reading the word bevel but I would
12 have to read it to check.
13     Q.   Okay?
14     A.   Do you know if it's in there.
15     Q.   I would like you check for me.
16         MR. CONNELLY: Can I ask what you're
17 directing him towards?
18         MS. LYNCH: I'm directing him to claim
19 one of Ushiwata which is attached to his
20 declaration.
21         MR. CONNELLY: Do you have a copy of
22 the 517 application which is what's at issue in

Page 77

1  this case? Are you just -- do you have a copy of
2  the 517 application?
3          MS. LYNCH: I'm actually showing him
4  something now. We can talk off line if you would
5  like.
6          MR. CONNELLY: Okay. So just let the
7  record reflect you're referring him to the claim 1
8  of the 294 patent, not the 517 application that's
9  been the subject of this case.
10         THE WITNESS: So you're asking me to
11 look for the word bevel within the claim?
12         MS. LYNCH: Right.
13     A.  (The witness complies.) Okay. Within
14 claim 1 of patent 294, the word bevel is not
15 present.
16         MS. LYNCH: Let's take a break. Do you
17 want to have lunch now or come back -- well, let's
18 take a break.
19         THE VIDEO OPERATOR: This ends disk
20 No. 1 of the Hatch deposition. The time is
21 11:42:49. Off the record.
22         On the record with disk No. 2 of the

Page 78

1  testimony of Paul Hatch in the matter of Hitachi
2  versus Dudas. The date is November 24th, 2008.
3  The time is 12:47:23.
4      BY MS. LYNCH:
5      Q.  Mr. Hatch, would you consider
6  industrial design to be an engineering discipline?
7      A.  It is widely recognized to be related
8  to engineering.
9      Q.  Would you consider it to be an
10 engineering discipline?
11     A.  I'm not sure what you mean by
12 engineering discipline. As such it entails some
13 aspects that an engineer would learn and practice.
14     Q.  Could you look at paragraph 12 of your
15 declaration for me, please?
16     A.  (The witness complies.)
17     Q.  You say "One of ordinary skill in the
18 art of designing rotary cutting power tools is a
19 person with a university degree in mechanical
20 industrial design or similar engineering
21 discipline with approximately four years of
22 experience in actual design or technical training

Page 79

1  and more design experience, approximately 10
2  years." Do you see that.
3      A.  Yes.
4      Q.  Would you say industrial design is an
5  engineering discipline?
6      A.  I think the one question has nothing
7  to do with the statement you just read.
8      Q.  Okay. So when you say similar
9  engineering discipline, you're talking about
10 something other than an industrial design?
11     A.  Industrial design or similar
12 engineering discipline. I see what you mean. It
13 is considered a type of -- well, it's related,
14 very closely related to engineering. I know a lot
15 of practice is very similar.
16     Q.  But it's not an engineering degree?
17         MR. CONNELLY: Object to form.
18     A.  There are lots of different types of
19 engineering.
20         BY MS. LYNCH:
21     Q.  Well, you're degree in industrial
22 design is not an engineering degree; is that

Page 80

1  correct?
2      A.  It's a degree in industrial design
3  which is related to engineering.
4      Q.  But it's not --
5      A.  Mechanical design is related to
6  engineering. Industrial design entails generally
7  a lot of aspects even more than say electrical
8  engineering.
9      Q.  Did the university you go to have an
10 engineering school?
11     A.  I believe it did.
12     Q.  Did it give engineering degrees?
13     A.  I don't think they would be called
14 engineering degrees. It would be within different
15 areas, mechanical engineering or production
16 engineering, electrical engineers.
17     Q.  You don't have one of those degrees,
18 you have an industrial design degree?
19     A.  I have an industrial design degree.
20         MR. CONNELLY: Objection. Let's wait
21 until there's an actual question as opposed to a
22 statement that's being made. Questions end with a

Page 81

1  question mark.
2      BY MS. LYNCH:
3      Q.  Then you say, "With approximately four
4  years experience in actual design or technical
5  training and more design experience approximately
6  10 years." So what does the more design
7  experience, approximately 10 years refer to?
8      A.  In this case, practicing design.
9      Q.  Is it actual design?
10     A.  Compared to not actual design?
11     Q.  Well, I'm trying to read your
12 sentence. You say, "With approximately four years
13 experience in actual design or technical training
14 and then and more design experience." So --
15     A.  Here --
16         MR. CONNELLY: Let's wait until there's
17 a question pending.
18         BY MS. LYNCH:
19     Q.  So could you explain to me what you
20 mean there?
21     A.  You're asking to explain what the
22 context of actual design is within this sentence?

Page 82

1  Q. The distinction you're drawing between
2  actual design and more design experience, that's
3  what I'm asking you to explain.
4  A. It's not distinguishing no design
5  experience but here the term actual design is, the
6  sentence says four years experience in actual
7  design or technical training. So in this context,
8  not necessarily are the person in question here
9  doesn't necessarily have to have actual design
10 training, they could have technical training.
11 Q. And then in addition, they're supposed
12 to have design experience of approximately 10
13 years?
14 A. As it says here and more design
15 experience, approximately 10 years. Yes.
16 Q. And how would you say that you fit or
17 don't fit this definition in paragraph 12 of your
18 declaration?
19 A. I fit.
20 Q. And can you tell me how?
21 A. Because I studied industrial design
22 and I have practiced it for around 15 years.

Page 83

1  Q. I'm going to read you what Mr.
2  Ushiwata said in his declaration. "I would regard
3  a person of ordinary skill in the power tool
4  design art at the time of my inventions, i.e. in
5  the early 1990s, to have been a mechanical
6  engineer or equivalent having at least five years
7  of experience designing power tools or someone
8  having technical training and 10 years of
9  experience designing power tools."
10    Would you fit the definition of a person of
11 ordinary skill that Mr. Ushiwata has set out?
12 A. I believe I would.
13 Q. How do you fit his definition?
14 A. He does mention or technical training
15 or -- could I have a copy of Ushiwata?
16 Q. Sure. Absolutely. I'm going to hand
17 the witness what was previously marked as
18 Plaintiff's Exhibit 10, which is the declaration
19 of Mr. Ushiwata. (Complies.) And I'll send you
20 to paragraph 9 of Mr. Ushiwata's declaration.
21 A. So your question was whether I fit his
22 definition?

Page 84

1  Q. Right.
2  A. Where he's referring to at the time of
3  his practice around the early 1990s. He does
4  refer to someone having at least five years of
5  experience designing power tools or someone having
6  technical training and 10 years of experience
7  designing power tools.
8  Q. And is it your testimony that you had
9  that in the early 1990s?
10    MR. CONNELLY: Objection.
11 Mischaracterizes the testimony.
12 A. That I had what in the 1990s, 10 years
13 experience?
14    BY MS. LYNCH:
15 Q. Right.
16 A. No. I did not have 10 years of
17 experience in the 1990s.
18 Q. When did you have 10 years of
19 experience designing power tools?
20 A. Almost five years ago.
21 Q. Are you a mechanical engineer?
22 A. I am trained as an industrial designer

Page 85

1  which is related and we practice similar
2  practices. On a daily basis we do a lot of
3  related work.
4  Q. But you're not a mechanical engineer?
5     MR. CONNELLY: Object to form. Is that
6  a question?
7  A. You're asking about my training. My
8  degree was in industrial design.
9     BY MS. LYNCH:
10 Q. Go back to the Johnson patent. Will a
11 blade tilt in both directions in Johnson?
12 A. In which both directions are you
13 referring to?
14 Q. Why don't you tell me how you believe
15 the blade will tilt in Johnson?
16 A. The intention of the patent is that
17 the blade would tilt or be movable in all axis
18 movement shown in Figure 2, however, as pointed
19 out, there are certain collisions of surfaces if
20 some or all of these are done at the same time.
21 Figure 2 shows sensor lines and not objects.
22 Q. So your testimony is when you did your

Page 86

1  CAD, what you found was that you didn't believe
2  that Johnson could do a bevel cut of 45 degrees
3  because something got in the way; is that right?
4      MR. CONNELLY:  Objection.
5  Mischaracterizes prior testimony.
6      A.   Prior to doing the CAD my judgement of
7  the illustration and the text within the Johnson
8  patent was that this was not designed to bevel to
9  the right by 45 degrees.
10     BY MS. LYNCH:
11     Q.   So it's your testimony that wasn't
12 designed to bevel.  Is it your testimony that it
13 wasn't capable of beveling to 45 degrees?
14     A.   I'm not sure of the difference that
15 you're looking at.  The item illustrated and
16 described did not focus on beveling to 45 degrees,
17 it was moot as far as this patent was written,
18 that was not a focus of the patent.
19     Q.   Can you point me to something in the
20 Johnson patent that says that you can't bevel to
21 45 degrees?
22     A.   Unfortunately he doesn't write about

Page 87

1  beveling to 45 degrees, it is completely missing
2  within the patent.  I don't believe he regarded
3  that as an important feature.  I have a strong
4  conviction that he did not believe that was an
5  important feature of this design that's why
6  there's nothing in the patent.
7      Q.   But do you see something in the patent
8  in the specification that prohibits this from
9  beveling to 45 degrees?
10     A.   There is something in the patent that
11 prohibits that and it's the illustration that is
12 used, several illustrations that are used.
13     Q.   So could you point me to those
14 illustrations?
15     A.   So within Figure 1 as explained in my
16 declaration there are objects that would instantly
17 collide.  Figure 2 and 3 do not show any objects.
18 Figure 4, Figure 5, Figure 6, Figure 7, Figure 8,
19 Figure 9, Figure 11 and more do show the items
20 that would lead to that collision.  A lot of
21 figures focus on the holding and receiving devices
22 that collide with the blade.

Page 88

1      Q.   What's the receiving device?
2      A.   As it's termed in the Johnson patent
3  it's referred to as the cup piece handling
4  mechanism, No. 15.
5      Q.   So you pointed me to Figures 4, 5, 6,
6  7, 8 and 9.  Can you point out what you're
7  referring to in those figures?
8      MR. CONNELLY:  Objection.
9  Mischaracterizes prior testimony.
10     A.   If you were asking what is shown in
11 those figures, Figure 4 --
12     Q.   Well, let's go back then and look at
13 your testimony.  So can I have the answer where he
14 referred to those figures?
15 (The last answer was read back by the Reporter.)
16     BY MS. LYNCH:
17     Q.   So I'm just asking you to point out
18 for me in each of the figures that you referred to
19 in that answer what you are referring to in that
20 answer?
21     A.   The items shown in those figures, most
22 of the figures that I listed in my reply are

Page 89

1  holding devices one way or the other.  They hold
2  the work piece in place and would collide with
3  item No. 17 when beveling 45 degrees to the right.
4      Q.   Is it your testimony that Johnson
5  allows beveling 45 degrees to the left?
6      A.   45 based on the illustration of
7  Figure 1.  I included an illustration in my
8  declaration which is shown on page 10 which showed
9  the left-hand bevel position.  The left-hand bevel
10 in my opinion is probably possible depending upon
11 the sizes of the items around it.  As it is shown
12 and illustrated, there are less collisions with
13 the blade.
14     Q.   So is it your testimony that the
15 left-hand can bevel to 45 degrees?
16     A.   The blade can be rotated 45 degrees to
17 the left in certain circumstances.
18     Q.   What are those circumstances?
19     A.   That the apparatus around it is moved
20 to the correct positions that will still allow
21 holding the work piece safely.
22     Q.   What do you mean move to the correct

Page 90

1  positions?
2      A.  The holding device on the left would
3  probably need to move further away from .21 and
4  not to be oversized, and the cutting -- I'm sorry,
5  the work piece would have to be relatively small
6  because if the work piece were deep or tall in
7  nature, then the holding device on the left would
8  be much larger and would collide with the, with
9  item No. 17.
10     Q.  Is it your opinion that these same
11 adjustments can't be made for the right-handed
12 bevel?
13     A.  They could not be made in a
14 satisfactory manner because to move them so far
15 away from .21 it would be detrimental in nature
16 for regular miter saw usage.
17     Q.  Why would it be detrimental?
18     A.  The further the holding devices are
19 moved away from .21, the more vibration there is
20 on the work piece as it's being cut and worse the
21 quality and angle of the cut would be.
22     On a larger work piece, there would be more

Page 91

1  strength and maybe less vibration.  It would still
2  be a rough cut.  This is my estimation looking at
3  the image, of course.  But the holding device
4  would not be able to hold such a large item
5  without getting in the way.
6      Q.  Did you attempt to recreate with your
7  CAD model left and right 45 degree miter cuts?
8      A.  That was not what I was trying to
9  illustrate in the declaration, 45 degree miter
10 cuts.
11     Q.  So is your answer that you did or you
12 didn't or?
13     A.  I did not illustrate -- I did not
14 intend to illustrate 45 degree miter cuts.
15     Q.  You said you didn't intend to
16 illustrate.  Did you illustrate?
17     A.  You asked me of my intentions.  The
18 illustration shown do not show the miter position.
19     Q.  Why did you attach the 294 patent to
20 your declaration?
21     A.  As a relevant reference, the 294
22 patent is very much associated with the case.

Page 92

1      Q.  In what way?
2      A.  That also demonstrates beveling.
3      Q.  Is that the reason you attached it?
4      A.  There are many reasons for having it
5  attached.  There are references throughout this
6  case about this patent.
7      Q.  What is your understanding of what the
8  basis of this lawsuit is?
9      A.  I'm not sure.  It seems a very general
10 question.
11     Q.  It is a general question.
12         MR. CONNELLY:  Doesn't mean you need to
13 be argumentative back to him.
14     A.  I don't know what answer you're
15 looking for with that question.
16         BY MS. LYNCH:
17     Q.  Okay.  Do you understand who the
18 parties are in this action?
19     A.  Yes.
20     Q.  Who are the parties?
21     A.  The USPTO and Hitachi Koki.
22     Q.  So do you understand what the basis of

Page 93

1  the action is?
2      A.  There is a dispute between the two
3  parties involving the said patents.  I was looking
4  for the correct legal term but the renewal of the
5  application.
6      Q.  Of what application?
7      A.  For the patent for -- I don't have the
8  number here.
9      Q.  Do you understand who is the plaintiff
10 and who is the defendant?
11     A.  Yes.
12     Q.  Do you understand what the plaintiff
13 is asking for in the lawsuit?
14     A.  Yes.
15     Q.  What is that?
16     A.  They are obviously wanting their --
17 the Hitachi -- they're looking to clarify some
18 disagreement over the patent that was declined --
19 sorry, the reissue of the patent that was declined
20 by the USPTO over a misunderstanding of a, of the
21 difference between miter and bevel.
22     Q.  Is that understanding something you've

Page 94

1  learned on your own, by reading or from lawyers?
2     A.   I think if lawyers had told me to say
3  that, I would have been more eloquent with my
4  answer. It is my understanding.
5     Q.   And what is your role in the lawsuit
6  as you see it?
7     A.   My role is as expert witness, I am
8  providing an independent, personal opinion to the
9  representative of one skilled in the art.
10    Q.   As to which topics?
11    A.   As to the case at hand. There is not
12 a specific area that I have been asked to stay
13 within or remain within the confines of.
14    Q.   You put forward a declaration in this
15 case, correct?
16    A.   Yes.
17    Q.   So that's what you formed an opinion
18 on for this case, correct?
19    A.   The declaration reflects my opinion.
20    Q.   Do you expect to testify beyond what's
21 in your declaration?
22    A.   No. I -- the declaration essentially

Page 95

1  explains my opinion on the matter succinctly.
2     Q.   Let me show you what was previously
3  marked as Plaintiff's Exhibit 11 and it's titled
4  memorandum opinion and order. I'll ask you,
5  Mr. Hatch, if you've ever seen this before?
6     A.   No, I haven't.
7     Q.   Could you go to page 2, please?
8     A.   (The witness complies.)
9     Q.   And do you see the last sentence in
10 the first paragraph it says, Claim 1 of the
11 reissue application provides for, then it begins a
12 desktop cutting machine and goes on for the rest
13 of the page?
14    A.   Yes.
15    Q.   Do you see that?
16    A.   Yes.
17    Q.   Do you have any understanding of what
18 that claim 1 is?
19    A.   Yes.
20    Q.   Okay. What is it?
21    A.   It's the claim 1 from the patent in
22 question.

Page 96

1     Q.   And does this claim 1 use either the
2  word bevel or miter in it?
3     A.   It -- the word bevel is certainly used
4  in the rest of the patent but not within this
5  text. The word bevel in particular is used in the
6  fist two sentences twice of that patent.
7     Q.   Of which patent?
8     A.   Sorry. The 294 patent. Ushiwata.
9     Q.   You said that you read about half of
10 Mr. Gililland's deposition?
11    A.   That's correct.
12    Q.   Do you believe that Mr. Gililland is a
13 person of ordinary skill as you've defined it?
14    A.   I do believe he is of skilled in the
15 art.
16    Q.   Is there anything that you disagreed
17 with in the part of Mr. Gililland's deposition
18 that you read?
19    A.   Yes.
20    Q.   What was that?
21    A.   I would need the document to refer to.
22    Q.   You can't remember sitting here

Page 97

1  anything in particular that you disagreed with?
2     A.   There were numerous items.
3     Q.   Do any come to mind?
4         MR. CONNELLY:  If we've got a copy of
5  the transcript we can go through it or is this a
6  memory test?
7     A.   That may be better. If you're looking
8  for something in particular, you could bring me to
9  it. There were 84 pages, each page having four
10 pages on it. It's a very long document. There
11 were a lot of comments that I do not agree with.
12        BY MS. LYNCH:
13    Q.   But unless I gave it to you, sitting
14 here you can't think of one off the top of your
15 head?
16        MR. CONNELLY:  Objection. That's not
17 even a question. We got to get actual questions
18 on the record before you answer.
19    A.   I can't.
20        BY MS. LYNCH:
21    Q.   Did you review Mr. Gililland's
22 declaration?